# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 56787-3-II |
| J.M., | |
| Appellant. | UNPUBLISHED OPINION |

CRUSER, A.C.J. — In February 2022, the King County Sheriff's Office sent JM to the emergency room after he was found outside the airport with flip flops and no socks on a cold, late evening. A designated crisis responder filed a petition for involuntary detention based on grave disability. JM was then transferred to the Metropolitan Development Council (MDC) in Tacoma where he was evaluated by a mental health professional and a physician. After conducting the evaluation, the mental health professional and physician filed a petition for 14-day involuntary treatment on the grounds that JM was gravely disabled. A superior court commissioner concluded that JM was gravely disabled under RCW 71.05.020(24)(b)[1] and provided written and oral findings of fact and conclusions of law. JM appeals the superior court's order detaining him for 14 days for

---

[1] RCW 71.05.020 has been amended since the petition was filed in this case. *See* LAWS OF 2022, ch. 210, § 2. Because the amendment did not alter the subsection of the statute at issue here, we cite to the current version of the statute.

involuntary treatment, arguing that there was insufficient evidence for the superior court to conclude that JM was gravely disabled.[2]

We affirm the superior court's order because substantial evidence supports the court's conclusion that JM was gravely disabled.

FACTS

I. JM's DETAINMENT

On February 13, 2022, an officer from the King County Sheriff's Office found JM standing outside the airport next to a car at 1 a.m. in 34-degree weather wearing flip flops and no socks. JM told the officer that a voice told him to wait there. He also told the officer he had not eaten or slept for two days. The officer sent him to the emergency room.

At the hospital JM endorsed auditory and visual hallucinations that told him, " 'How to be equal with god and how to marry good and form kids.' " Clerk's Papers (CP) at 2. Laura Wood, a clinical social worker, met with JM at the hospital and stated in her declaration that it was unclear how long JM had been on the street because it appeared he was "somehow caring for his hygiene and obtaining food." *Id*. at 5. She also noted that JM claimed to hear voices from God and his thought content was disconnected from reality. Wood recommended hospitalization for safety and stabilization and referred JM to a designated crisis responder. The designated crisis responder filed a petition for initial detention requesting that JM be involuntarily detained because he was in

---

[2] Appeals involving involuntary commitments are not moot because prior involuntary commitment orders have potential collateral consequences. *In re Det. of M.K.*, 168 Wn. App. 621, 626, 629-30, 279 P.3d 897 (2012). Accordingly, we address this appeal even though the 14-day involuntary treatment period has expired.

imminent danger due to grave disability. The designated crisis responder based the petition on an interview with JM and a consultation with the emergency room physician.

Three days later, on February 16, 2022, Hanna Devine, a mental health professional, and Frantz Alphonse, the examining physician at MDC, conducted a mental status evaluation of JM. Subsequently, Devine and Alphonse filed a petition for 14-day involuntary treatment on the grounds that JM was gravely disabled.

## II. THE HEARING

On February 18, 2022, a superior court commissioner held a hearing regarding the petition to determine if there was probable cause to detain JM for 14 days. The State called Devine in support of the petition. Devine was the only witness who testified at the hearing.

JM's appearance and hygiene were fair, and he was cooperative during the evaluation. However, JM was anxious and disorganized, which Devine acknowledged may have been due to JM's confinement and the fact that English was not his first language. JM was oriented to person, place, and time but his orientation to situation was severely impacted by his mental health symptoms. His short-term memory was impaired by his current psychotic symptoms impacting his memory to recall events. Specifically, JM had a delusional belief that he was brought to MDC by "Arizona internet to have his veins (sic) charged" to help him "become strong and learn how to cook." Verbatim Rep. of Proc. (VRP) at 12, 14. His speech had a flattened affect and was rapid, disorganized, and tangential even though Devine was able to understand him.

Devine opined that JM's thought process was impaired because of his "fair amount of delusional thought content." *Id.* at 13-14. In addition to JM's belief that he had been brought to MDC by "Arizona internet to have his veins (sic) charged" so that he could "become strong and

learn how to cook," Devine noted that JM reported "the trees speak to him and there are hanging heads and people from the trees that he sees."[3] *Id.* at 12, 14. JM continued to report command hallucinations while at MDC, but he did not share what they were telling him to do. Nonetheless, he reported the voices were similar and unchanged. JM was unable to act upon command hallucinations while in the controlled setting at MDC.

Although JM had some insight into describing the symptoms he was experiencing, he lacked the insight that they were connected to a mental health diagnosis requiring treatment and did not understand that he suffered from a mental illness. JM also did not see the need for medication in the community or continued mental health treatment.

Devine opined that JM had schizophrenia. Devine further opined that JM was gravely disabled under RCW 71.05.020(24)(b). More specifically, Devine opined that JM was showing severe deterioration in his routine functioning as evidenced by repeated and escalating loss of cognitive control. Devine acknowledged that JM was not assaultive at MDC, so she was mainly concerned with JM's "cognitive control." *Id.* at 15. Devine was concerned that JM lacked the insight to not follow what the voices were telling him to do. JM did not understand the impact the voices had on him or why he was being detained at MDC. She also noted that JM was unable to engage in discharge planning due to the severity of his symptoms.

Devine opined that JM would further decompensate if he did not seek treatment for his mental disorder in an inpatient setting, which could lead to re-detainment. Devine was also concerned that JM would follow the voice commands if he was not in a controlled environment

---

[3] JM gave conflicting accounts regarding the amount of time he had been hearing voices. He told Wood he had been hearing voices from God for a year and two months. On the other hand, JM told Devine he had been hearing voices since he was nine years old.

and it would be dangerous for him. Devine further opined that a less restrictive alternative was not in JM's best interests because of JM's impairment.

### III. COURT'S RULING

The commissioner found that JM had a severe deterioration in routine functioning shown by repeated escalating and significant loss of cognitive control.[4] The commissioner noted that JM's judgment and insight were impaired. JM did not see the need for outside mental health treatment or medications once released. The commissioner found that without involuntary treatment, JM would not receive the care that is essential for his health and safety. As a result, harmful consequences such as further decompensation and impairments in cognitive control that could lead to re-detainment would likely result. The commissioner also found that JM was unable to make rational decisions regarding his need for treatment because of the severe deterioration in his mental functioning. The commissioner noted that JM's statement that he did not need mental health treatment or medications once released demonstrated his inability to make rational decisions regarding his need for treatment.

The commissioner ordered JM to be detained for 14 days because he was gravely disabled as defined by RCW 71.05.020(24)(b). JM appeals.

### DISCUSSION

JM appeals the order detaining him for 14 days for involuntary treatment. JM argues that the evidence is insufficient to support the trial court's conclusion that he was gravely disabled under RCW 71.05.020(24)(b). Specifically, JM contends that the evidence is insufficient because

---

[4] The commissioner based her finding of severe deterioration in routine functioning on JM's repeated and significant loss of cognitive, not volitional, control.

it does not show a factual basis for concluding that JM was not receiving or would not receive, if released, care as is essential for his health and safety. JM also argues that he was not unable to make a rational decision with respect to his need for treatment due to severe deterioration of mental functioning because he was not so impaired as to act on what the voices were telling him to do. Lastly, JM claims that there was no evidence that the voices caused him to bother himself or anyone else and the voices tried to compel him to engage in beneficial behavior.

The State argues that the court's finding of grave disability was supported by sufficient evidence that JM exhibited repeated and escalating loss of cognitive control precluding him from seeing to his own health and safety needs. We agree with the State.

A. LEGAL PRINCIPLES

1. *Gravely Disabled*

"The petitioner's burden of proof at a 14-day commitment hearing is preponderance of the evidence." *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022); RCW 71.05.240(1), (4).[5] A person suffering from a mental disorder can be found gravely disabled under either of two statutory grounds. Under the first ground, the court considers if the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(24)(a). Under the second ground, the court considers if the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24)(b).

---

[5] RCW 71.05.240 has been amended since the petition was filed in this case. *See* LAWS OF 2022, ch. 210, § 13. Because the amendment does not impact our analysis, we cite to the current version of the statute.

The evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered. *In re Det. of LaBelle*, 107 Wn.2d 196, 208, 728 P.2d 138 (1986). It is not enough to merely show that an individual has a mental illness or that care and treatment is in the person's best interests. *Id.* Rather, treatment must be shown to be essential to an individual's health or safety. *Id.* The evidence must show a recent and significant loss of cognitive or volitional control. *Id.* Implicit in this definition is that the individual is unable, because of a severe deterioration in mental functioning, to make rational choices regarding treatment. *Id.* The second definition of gravely disabled allows intervention before a mentally ill person decompensates and provides for continuity of care and treatment that could break the cycle and restore the individual to satisfactory functioning. *Id.* at 206.

2. *Sufficient Evidence*

"An appellate court reviewing the trial court's decision on [a 14-day] involuntary commitment considers whether the trial court's findings of fact are supported by substantial evidence and if the court's findings of fact support the court's conclusions of law and judgment." *A.F.*, 20 Wn. App. 2d at 125. " 'Substantial evidence' is the quantum of evidence sufficient to persuade a fair-minded person." *Id.* (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). "When considering if there was sufficient evidence, we view the evidence in the light most favorable to the petitioner." *Id.* "We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence." *Id.*

B. ANALYSIS

The record shows sufficient evidence that JM suffered from a severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive control. Devine testified

that JM had schizophrenia. Additionally, JM thought he arrived at MDC by way of the "Arizona internet to have his veins (sic) charged" to "become strong and to learn how to cook." VRP at 12, 14. JM reported that "the trees speak to him and there are hanging heads and people from the trees that he sees." *Id.* at 14. Devine testified that JM was unable to engage in discharge planning or a reality-based safety plan due to the severity of his symptoms.

The record provided substantial evidence to support the superior court's conclusion that JM would not receive care that is essential for his health and safety if released. On the night of the incident leading to his detainment JM was wearing flip flops with no socks in 34-degree weather because voices told him to wait there. JM argues that he was hygienic, well nourished, and clothed at the time of detention and as a result the State did not meet its burden of proof. Although the social worker at the emergency room noted that it appeared JM had somehow been caring for his hygiene and obtaining food, JM also said that he had not eaten or slept for two days prior to the incident. Moreover, Devine's testimony regarding JM's inability to engage in discharge planning or a reality-based safety plan provided further evidence that JM would not receive care essential for his health and safety if released.

Devine additionally testified that she was concerned that JM's impaired judgment and insight would impact his health and safety in the community. Devine was concerned that it would be dangerous for JM if he was not in a controlled environment because he lacked the insight to not follow what the voice commands told him to do and he did not understand how the voices caused detention at MDC.

The evidence further demonstrated that JM was incapable of making rational decisions about his health due to his impaired insight and judgment from a severe deterioration of mental

functioning. JM was standing outside the airport at 1 a.m. in 34-degree weather because he heard voices that told him to do so. This highlights that the voices compelled JM to engage in harmful behavior to himself and he acted on those commands. JM's delusions prevented him from understanding how he arrived at MDC. Devine testified that JM did not understand that his symptoms were connected to a mental health diagnosis requiring treatment. Devine also testified that JM did not see the need for medication, either in the community or for continued mental health treatment.

In *LaBelle*, the supreme court concluded that the inability to understand a need for treatment in addition to a minimal likelihood of taking the medication necessary to stabilize mental deterioration upon release tended to show that hospital treatment was essential to the individual's health and safety. *LaBelle*, 107 Wn.2d at 213. Similarly, JM demonstrated both a lack of awareness of his mental illness and the resulting need for medication. Additionally, JM demonstrated that it was likely that he would not continue taking medication upon release or seek out mental health services.

Viewing the evidence in the light most favorable to the petitioners, we hold that the trial court's conclusion that JM was gravely disabled was supported by substantial evidence.

CONCLUSION

We affirm the superior court's involuntary treatment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 56787-3-II

CRUSER, A.C.J.

We concur:

LEE, J.

PRICE, J.