# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 54565-9-II |
| A.F.,<br><br>                    Appellant. | PUBLISHED OPINION |

CRUSER, J. – AF appeals the order detaining him for 14 days for involuntary treatment.[1]
AF argues that the trial court's findings were not sufficient to allow for meaningful review, the
trial court's factual findings were not supported by substantial evidence and that, therefore, its
conclusion that he was gravely disabled was erroneous, and the trial court failed to properly inform
AF regarding his firearm rights under RCW 71.05.240(2).[2]

We hold that the trial court's findings were sufficient to permit meaningful review, that
they were supported by substantial evidence, and that they, in turn, supported the trial court's
conclusion that AF was gravely disabled. We decline to consider whether the trial court failed to

---

[1] We note that even though this order has since expired, this case is not moot because it has been
well established that the order has potential collateral consequences. *In re Det. of M.K.*, 168 Wn.
App. 621, 629-30, 279 P.3d 897 (2012).

[2] RCW 71.05.240 has been amended since AF was committed in January 2020. LAWS OF 2020, ch.
302, § 39. However, this amendment has no meaningful impact on this case; therefore, we cite to
the current version.

properly inform AF regarding his firearm rights under RCW 71.05.240(2) because AF did not preserve this issue for review. Accordingly, we affirm.

## FACTS

### I. AF'S DETAINMENT HISTORY

A few months prior to the order at issue in this appeal, AF was admitted to Western State Hospital (WSH) because he was found to be a danger to others. However, in the days leading up to the involuntary commitment, AF had been staying at WSH voluntarily. When AF decided to leave against medical advice, staff at WSH petitioned for a 72-hour hold, which was granted. WSH then petitioned for 14 days of involuntary treatment on the grounds that AF was gravely disabled. Doctor Wendi Wachsmuth, along with a medical doctor, brought the petition and attached a signed declaration.

### II. THE HEARING

In January 2020, the court held a hearing to determine if there was probable cause to detain AF for 14 days. The State called Dr. Wachsmuth, two of AF's social workers, and AF's son in support of the petition. At the hearing, the court orally informed AF that "if we go to a full hearing and I sign an order of detention, [then] you [will] lose your firearm rights." Sealed Verbatim Report of Proceedings (VRP) at 17.

#### A. DR. WACHSMUTH'S TESTIMONY

In preparation of the hearing, Dr. Wachsmuth reviewed AF's chart, reviewed available electronic records pertaining to AF, interviewed AF, and interviewed members of AF's treatment team.

AF was "largely appropriate for the interaction" with Dr. Wachsmuth, but he also made delusional or incorrect statements. *Id.* at 9. AF was "oriented in all spheres," understood his situation, his memory was "primarily intact," and his thought process was also "[l]argely logical, linear, [and] goal-directed." *Id.* at 9, 11. However, AF's speech was "quiet," "halting," and "latent." *Id.* at 10. There was often a lag between a question and AF's response. Dr. Wachsmuth was unsure if AF's speech difficulties were related to interference from internal stimulation or to his Parkinson's disease. AF reported "insertion delusions" and that people sent him messages. *Id.* at 11.

Dr. Wachsmuth learned from the staff that AF paced, had been agitated, and acted in an intrusive and aggressive manner. This included AF telling staff members, who he believed were of African or African American descent, that they were dying, their parents were dead, and they should return to Africa. Dr. Wachsmuth believed that AF's delusions caused him to angrily express these thoughts. Attempts to calm AF were unsuccessful.

During a brief conversation with Dr. Wachsmuth that was free of stimulation, AF was able to maintain control. However, Dr. Wachsmuth was concerned that AF's delusional thoughts and his physical reactions indicated "a lack of cognitive and volitional control." *Id.* at 15. Dr. Wachsmuth believed that the intensity and frequency of AF's mental health symptoms had escalated over the previous two weeks.

AF also suffered from Parkinson's disease. Parkinson's originates in the brain and results in physical disabilities, and it can also cause cognitive deficits in an advanced stage. Dr. Wachsmuth noted that while she spoke with AF his head and neck would move involuntarily; the

doctor believed that the movement was related to AF's Parkinson's. AF also had tremors that impacted his entire body.

Regarding AF's mental health diagnosis, Dr. Wachsmuth opined that AF suffered from bipolar type one, and that he exhibited symptoms indicative of schizo-affective disorder.

AF acknowledged to Dr. Wachsmuth that he had mental health problems, which he described as anger and a temper. AF did not articulate what medication he took or how his symptoms impacted his ability to function, but he took medications when prompted.

Given AF's physical impairments, Dr. Wachsmuth believed that AF did not have a viable plan once discharged. AF needed assistance throughout the day to ensure he could conduct his daily living activities, and he needed to be at a place that could provide him with 24-hour care. However, AF failed to acknowledge his physical limitations, and AF did not articulate a plan to take care of his physical needs.

Dr. Wachsmuth opined that AF was gravely disabled under both RCW 71.05.020(24)(a) and RCW 71.05.020(24)(b).[3] Dr. Wachsmuth explained that AF was not physically capable of caring for himself and that his mental illness prevented him from seeking out appropriate medical care. AF no longer needed to be at WSH, but he also could not be discharged without some type of support.

---

[3] RCW 71.05.020 has been amended since AF was committed in January 2020. LAWS OF 2020, ch. 302, § 3. However, this amendment has no meaningful impact on this case; therefore, we cite to the current version.

B. Social Workers' Testimony

A discharge social worker, Vickie Lanciano, also testified. Lanciano spent two months looking for a placement for AF. However, Lanciano had been unsuccessful because AF's son, who had durable power of attorney, had not been willing to work with her to determine AF's assets. AF told Lanciano that, if released, he would go to his son's home to get his phone and money, then he would visit family in Bellevue or Kirkland.

A psychiatric social worker, Shannon Rawlings, also testified. Rawlings regularly worked with AF, and testified that AF had become more agitated in the days leading up to the hearing.

C. AF's Son's Testimony

AF's son, JF, visited AF about once a week, and he noticed that AF had become more agitated and aggressive. During JF's last visit with AF prior to the hearing, AF insisted that JF was not actually his son, and that his son was really at the South Pole. When JF asked AF if he knew JF's name, AF did not respond. However, by the time JF left, AF recognized that JF was his son again.

JF also feared that his own safety would be at risk if he allowed AF to return to his home. For example, AF had previously fought with JF and, on four occasions, had pulled a knife on JF. Based on his fear of AF, JF had installed locks on the doors. Prior to AF's hospitalization, JF occasionally had to force AF to take his medication and AF would become aggressive as a result.

AF also "escaped," as JF put it, multiple times. *Id.* at 43. On one occasion, AF left the house unexpectedly, and JF sought help from the police to find him. On another occasion AF and JF were in a doctor's office, and AF left out a back door during his appointment, leaving JF in the

waiting area. JF was concerned that if AF were to return to his home, these behaviors would continue.

JF also testified that he was not married and AF had no other family members in the area.

### III. COURT'S RULING

The court found that AF's diagnoses were bipolar disorder, type one (partial remission) and Parkinson's disease. The court found that as a result of a mental disorder AF was "in danger of serious physical harm resulting from a failure to provide for his . . . essential human needs of health or safety" and that AF "manifest[ed] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his . . . actions and is not receiving such care as is essential for his . . . health or safety." Sealed Clerk's Papers (CP) at 21. The court's findings included summaries of the testimony of Dr. Wachsmuth, the two social workers, and JF. The court stated that "based on the verified [p]etition and the testimony of Petitioner, the Respondent [sic: Respondent is not physically caring for himself. He cannot appropriately seek medical or mental health care." *Id.* (emphasis omitted).

The court ordered AF to be detained because he was gravely disabled as defined by RCW 71.05.020(24)(a) and (b).

AF appeals.

### DISCUSSION

#### I. SUFFICIENCY OF FACTUAL FINDINGS

AF argues that the trial court's findings are inadequate because they contain boilerplate statutory language. Thus, he contends, the findings are insufficient to permit meaningful review of the trial court's conclusion that he is gravely disabled.

We disagree.

The court must enter written findings of fact and conclusions of law after a probable cause hearing when deciding whether an individual should be involuntarily committed for 14 days. MPR 2.4(b)(4). Requiring written findings of fact and conclusions of law guarantees that the trial court has fully and properly dealt with the issues in the case as well has fully informed the parties and reviewing courts as to the basis of the court's decision. *In re Det. of LaBelle*, 107 Wn.2d 196, 218-20, 728 P.2d 138 (1986). The written findings of fact and conclusions of law the trial court enters "must be sufficiently specific to permit meaningful review." *Id.* at 218. To be sufficiently specific, the findings should at least indicate the factual basis for the court's conclusions. *Id.* However, the degree of required particularity depends on each individual case. *Id.* "Findings may be sufficient even if they are implicit in the trial court's formal written findings of fact." *State v. Budd*, 185 Wn.2d 566, 578, 374 P.3d 137 (2016).

Relying on *LaBelle* and *In re Detention of G.D.*, 11 Wn. App. 2d 67, 450 P.3d 668 (2019), AF complains that the trial court's findings merely parrot statutory language and do not include credibility determinations. In both *LaBelle* and *G.D.*, the findings lacked a factual basis for the trial court's legal conclusion. *LaBelle*, 107 Wn.2d at 219; *G.D.*, 11 Wn. App. 2d at 70. In *LaBelle*, the findings contained standardized language and did not even indicate which statutory definition of gravely disabled the trial court relied upon. 107 Wn.2d at 219. Similarly, in *G.D.*, the court only entered cursorily check box findings. 11 Wn. App. 2d at 70.

The findings in this case are a far cry from those in *LaBelle* and *G.D.* Here, the trial court's findings included summaries of the witness testimony, with the clear inference that the portions of the testimony recited were found reliable by the trial court and supported its conclusion that AF

was gravely disabled. The findings state that AF was not able to physically care for himself or seek appropriate "medical or mental health care." CP at 21. The findings further indicate AF's diagnoses of bipolar disorder, type one (partial remission) and Parkinson's disease. In sum, the trial court's findings provide the factual basis for its conclusion that AF was gravely disabled. *LaBelle*, 107 Wn.2d at 218-20.

To the extent that AF also complains about the trial court's failure to make credibility findings, it is plain to us that the trial court's reliance on the testimony of the witnesses presented by the State include implied findings by the trial court of credibility and reliability.[4] These findings are sufficient to permit meaningful review.

## II. SUFFICIENCY OF THE EVIDENCE

AF argues that the evidence is insufficient to support the trial court's conclusion that he is gravely disabled.[5] We disagree.

### A. LEGAL PRINCIPLES

#### 1. Gravely Disabled

The petitioner's burden of proof at a 14-day commitment hearing is preponderance of the evidence. RCW 71.05.240(1), (4). A person suffering from a mental disorder can be found gravely disabled under two different statutory definitions. Under the first definition, the court considers if

---

[4] AF relies solely on a footnote in *State v. Coleman*, 6 Wn. App. 2d 507, 516 n.40, 431 P.3d 514 (2018), in which the court observed that findings of fact that merely summarize testimony, without credibility determinations, "can be problematic." Findings of fact, as the court noted, should resolve factual questions, not merely recite a witness' testimony. *Coleman*, 6 Wn. App. 2d at 516 n.40. Despite this complaint, the findings in *Coleman* were upheld by the court. *Id.* at 522.

[5] AF also claims in passing that the trial court failed "to resolve disputed factual issues." Br. of Appellant at 10. AF fails to explain what facts he believes are in dispute. Nor is it clear what disputed fact AF could be referring to because the State was the only party to provide any evidence.

the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(24)(a). Under the second definition, the court considers if the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24)(b).

### 2. Sufficient Evidence

An appellate court reviewing the trial court's decision on involuntary commitment considers whether the trial court's findings of fact are supported by substantial evidence and if the court's findings of fact support the court's conclusions of law and judgment. *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person." *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). When considering if there was sufficient evidence, we view the evidence in the light most favorable to the petitioner. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019). We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence. *H.N.*, 188 Wn. App. at 763; *In re Vulnerable Adult Petition for Knight*, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

B. ANALYSIS

### 1. Gravely Disabled Under RCW 71.05.020(24)(a)

AF argues that the State's evidence was speculative and insubstantial. AF contends that Dr. Wachsmuth was the only witness to testify whether AF was gravely disabled and that her testimony was conclusory and vague because she did not explain AF's physical difficulties, or the

daily activities AF needed help with. AF also argues that Dr. Wachsmuth should not have relied on AF's uncertainty about his discharge plan when forming her opinion.

As we note above, a person is gravely disabled under RCW 71.05.020(24)(a) if the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." The court should not impose "majoritarian values" on someone who chooses a lifestyle that might be considered "eccentric, substandard, or otherwise offensive." *LaBelle*, 107 Wn.2d at 204. Instead, there must be evidence that the individual has failed or is unable to provide for essential needs such as "food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *Id.* at 204-05.

Here, the evidence demonstrated a high probability of serious harm to AF because his mental illness prevented him from recognizing and planning for his physical limitations when providing for his essential needs. RCW 71.05.020(24)(a). AF suffered from Parkinson's disease, a disease that originates in the brain and creates physical disabilities, and can also cause cognitive deficits when in an advanced stage. Dr. Wachsmuth noted that AF's head and neck would move involuntarily when she spoke with him, and she believed that the movement was related to AF's Parkinson's. AF also exhibited tremors throughout his body. Dr. Wachsmuth testified that because of AF's physical difficulties, AF needed "pretty much around the clock" care. VRP at 14. However, AF could not provide Dr. Wachsmuth any details on how he would manage his mental and physical healthcare, and he could not articulate what medication he takes. AF did not even acknowledge that he needed care for his physical difficulties. Dr. Wachsmuth explained that AF's

mental illness, specifically his bipolar symptoms that relate to delusional thought and lack of volitional control, prevented AF from seeking out and obtaining appropriate care.

The trial court's conclusion that AF is gravely disabled under RCW 71.05.020(24)(a) is supported by substantial evidence.

*2. Gravely Disabled Under RCW 71.05.020(24)(b)*

AF also argues that the evidence is insufficient to support the trial court's conclusion that he is gravely disabled under RCW 71.05.020(24)(b) because it does not show that he suffered severe deterioration in his routine functioning.

Under this second prong of the statute the State must prove that the individual "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24)(b). The evidence must show a recent and significant loss of cognitive or volitional control. *LaBelle*, 107 Wn.2d at 208. Implicit in this definition is that the individual is unable, because of a severe deterioration in mental functioning, to make rational choices regarding treatment. *Id.* The second definition of gravely disabled allows intervention before a mentally ill person decompensates and provides for continuity of care. *Id.* at 206.

Although AF contends that the trial court based its conclusion on the uncertainty of his future living accommodations, which is an insufficient basis on which to commit a mentally ill person, the evidence belies this assertion. The evidence showed that AF was losing cognitive and volitional control. Dr. Wachsmuth testified AF was able "to briefly maintain cognitive and volitional control when necessary," but it was an intermittent ability that he could not maintain over the course of time. VRP at 15. Additionally, in a visit shortly before the hearing, AF was

11

unable to recognize his son and told his son that his son was actually at the South Pole. Dr. Wachsmuth also testified that AF experienced delusional thought content and physically reacted to that content, indicating he lacked cognitive and volitional control. The intensity and frequency of AF's mental illness symptoms had increased in the weeks leading up to the hearing.

The evidence further demonstrated that AF was unable to make rational choices regarding his care due to his impaired judgment and "superficial insight." *Id.* at 13. Dr. Wachsmuth explained that AF's bipolar symptoms and delusional thoughts kept him from seeking out appropriate care. AF also said he intended to visit family members in the area after discharge, but JF testified that AF had no relatives in the area. This further suggests that AF lacked the ability to make rational choices about his care following his discharge from the hospital.

The trial court's conclusion that AF is gravely disabled under RCW 71.05.020(24)(b) is supported by substantial evidence.[6]

### III. Loss of Firearm Rights

AF argues that the trial court failed to properly inform him, in accordance with RCW 71.05.240(2), that his failure to make a good faith effort to seek voluntary treatment would result

---

[6] AF contends that the court erroneously relied on the petition in making its commitment decision. But AF does not identify, nor is it clear, how the court relied on the petition. AF is correct that in the order, the court stated, "*[B]ased on the verified Petition* and the testimony of Petitioner, the Respondent [sic]: Respondent is not physically caring for himself." CP at 21 (emphasis altered). However, each of the assertions pertaining to AF's condition contained in the petition were repeated at the hearing through the testimony of the witnesses.

AF also contends that Dr. Wachsmuth's testimony was conclusory and relied on inadmissible hearsay. But Dr. Wachsmuth's opinion was admitted under ER 703. Under ER 703 an expert may use facts or data that are not otherwise admissible, if those facts and data were used to develop the expert's opinion and if experts in that particular field rely on those facts and data to form their opinions.

in the loss of his right to possess firearms if he was subsequently detained for involuntary treatment.[7]

We decline to review this claim of error for the first time on appeal because this issue was not preserved.

A. LEGAL PRINCIPLES

*1. RAP 2.5(a)*

An appellate court may refuse to review an issue that was not raised before the trial court. RAP 2.5(a). However, an appellant may raise for the first time on appeal a manifest error affecting a constitutional right. RAP 2.5(a)(3). To prove the error was manifest, the appellant must make a " 'plausible showing' " that the alleged error had " 'practical and identifiable consequences.' " *State v. A.M.*, 194 Wn.2d 33, 39, 448 P.3d 35 (2019) (internal quotation marks omitted) (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)).

*2. RCW 71.05.240(2)*

Under RCW 71.05.240(2), when there is a petition for 14 days of involuntary commitment for mental health treatment, the court at the probable cause hearing "shall inform the person both orally and in writing that the failure to make a good faith effort to seek voluntary treatment as provided in RCW 71.05.230 will result in the loss of [that person's] firearm rights if the person is subsequently detained for involuntary treatment under [RCW 71.05.0240]."

---

[7] AF acknowledges that the court orally advised him that he would lose his right to possess firearms if he were involuntarily committed. However, he challenges both the deficiency of the warning, in that it did not contain the advisement regarding his ability to voluntarily seek treatment, and the trial court's failure to provide the warning in writing, as required by RCW 71.05.240(2).

B. ANALYSIS

AF acknowledges that he raises this claim of error for the first time on appeal. He asks us to review the claim, nonetheless, relying on *In re Detention of T.C.*, 11 Wn. App. 2d 51, 450 P.3d 1230 (2019). In *T.C.*, Division One of this court considered whether TC could raise, for the first time on appeal, a claim that the court failed to inform him that he could avoid losing his ability to possess firearms if he volunteered for treatment. 11 Wn. App. 2d at 62-63. Division One concluded that the trial court's failure to properly notify TC implicated TC's constitutional right to possess firearms. *Id.* at 62. Additionally, the court held that the error was manifest because TC may have volunteered for treatment, negating the need for a hearing and detainment order, had he been properly informed. *Id.* Thus, the court held, TC had shown that the error had practical and identifiable consequences to the proceeding. *Id.*

If there was constitutional error in this case, we are unpersuaded it is manifest. First, it is questionable that a claim of manifest error can be predicated on a hypothetical assertion that a party may have voluntarily sought mental health treatment. On this point, we depart from the decision in *T.C.* Second, the record does not reflect that AF had the right to possess firearms at the time of his 14-day commitment hearing. A little over a year before this commitment proceeding, AF had been involuntarily committed for 180 days. When the previous commitment order was entered, AF lost his right to possess firearms until such time as his right is restored by the superior court. RCW 9.41.040(2)(a)(iv);[8] RCW 71.05.240(6). AF does not suggest or claim that his right to possess firearms had been restored under RCW 9.41.047(3), nor does he attempt to supplement

---

[8] RCW 9.41.040 has been amended since AF was committed in January 2020. LAWS OF 2020, ch. 29, § 4. However, this amendment has no meaningful impact on this case; therefore, we cite to the current version.

our record with evidence that his right was restored. Absent such a showing, AF cannot demonstrate that the trial court's failure to provide him the full statutory advisement under RCW 71.05.240(2) had a practical and identifiable consequence to the proceeding because he cannot show that the commitment order resulted in the loss of his right to possess firearms.

Even assuming AF still had the right to possess firearms, our record is devoid of any evidence indicating AF would have voluntarily sought mental health treatment had he believed that by doing so, he could retain this right. There is nothing in the record to indicate that AF owned firearms or that the threat of losing the ability to possess firearms would have caused him to voluntarily seek treatment.

Rather, the evidence showed that AF was no longer amenable to voluntary treatment and wished to discontinue treatment against medical advice. On this record, there is no basis for us to conclude that AF might have voluntarily sought mental health treatment, or that the trial court would have accepted his voluntary treatment plan. Thus, AF fails to show that the trial court's alleged error had any practical and identifiable consequences on the proceeding. *A.M.*, 194 Wn.2d at 39.

Moreover, AF's contention that RCW 71.05.240(2) guarantees that an individual can retain their firearm rights if they volunteer for treatment is unsupported by the plain language of the statute. The statute provides only that "the failure to make a good faith effort to seek voluntary treatment . . . will result in the loss of his or her firearm rights if the person is subsequently detained for involuntary treatment." RCW 71.05.240(2). In other words, the loss of firearm rights is *guaranteed* if the individual fails to volunteer in good faith for treatment and a commitment order is entered. RCW 71.05.240(2). The statute does not guarantee, however, that a person will *keep*

their firearm rights if the person voluntarily seeks treatment; rather, the statute provides that the person will be guaranteed to *lose* their firearm rights if they do *not* voluntarily seek treatment. AF contends that the statute contains a guarantee that is simply absent from the plain language of the statute.

We decline to review AF's claim that he is entitled to relief from his commitment order based on the trial court's error in failing to provide him with the full advisement under RCW 71.05.240(2).[9]

CONCLUSION

The trial court's findings are sufficient to permit meaningful review and substantial evidence supports the trial court's conclusion that AF is gravely disabled under both definitions of gravely disabled. We decline to review AF's claim that the trial court failed to fully advise him of the commitment order's potential impact on his firearm rights under RCW 71.05.240(2) because AF failed to preserve this error for review. Accordingly, we affirm.

_____
CRUSER, J.

We concur:

_____
GLASGOW, A.C.J.

_____
VELJACIC, J.

---

[9] AF does not argue that the trial court's failure to properly advise him under RCW 71.05.240(2) resulted in a due process violation. Because AF raises only the potential loss of his constitutional right to bear arms, we likewise confine our review to that constitutional claim.