# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>M.F.,<br><br><div align="center">Petitioner.</div> | No. 57590-6-II<br><br>UNPUBLISHED OPINION |

MAXA, J. – MF appeals the trial court's order involuntarily committing her for 14 days of treatment based on the conclusion that she was gravely disabled. We conclude that the court's written findings of fact were sufficient to provide for meaningful review, but that those findings are inconsistent with and do not support the legal conclusion that MF was gravely disabled. Therefore, we reverse the trial court's involuntary commitment order.

<div align="center">FACTS</div>

*Background*

Law enforcement encountered MF walking back and forth across a street a day after she was supposed to enter voluntary inpatient treatment as a result of an evaluation by a designated crisis responder. After MF expressed delusional thoughts, law enforcement took her to a hospital and requested an evaluation pursuant to the Involuntary Treatment Act, chapter 71.05 RCW. At the hospital, MF told a designated crisis responder that she had ingested fertilizer and that she was concerned about fertilizer poisoning, although she also said she had not come into contact with fertilizer. MF spoke about "being ascended" and going to heaven. Report of Proceedings

(RP) at 7.  The designated crisis responder successfully petitioned to have MF detained at an evaluation and treatment facility for up to five days.

While detained at the facility, MF continued to speak about being ascended, at one point saying that she needed to go home because "God couldn't find her" at the facility.  RP at 9. When she saw a different patient receiving an injection, "she became fixated on . . . receiving that injection so she could be ascended."  RP at 9.  Staff once observed MF eating food from a garbage container and had to escort her away.  A few minutes later, she went to the nurse's station and asked for the food back.  Although MF did not say she was suicidal, she occasionally made statements such as, "My life isn't worth living."  RP at 9.

MF was able to make her needs known at the facility, but she required staff to redirect her or assist her in meeting those needs.  And MF took her medications, but she expressed ambivalence about taking them, saying things like, "I shouldn't have done those.  I can't be saved now."  RP at 9.

MF's examining physician and examining mental health professional petitioned to have MF undergo additional involuntary treatment for up to 14 days, alleging that she was gravely disabled.

*Probable Cause Hearing*

At the probable cause hearing in June 2022, Amanda Ross, the mental health professional, testified for the State.  She stated that she had evaluated MF both the previous day and when she was initially admitted, and nothing about MF's presentation had changed in the five days between those evaluations.  Ross said that although MF was oriented to person, place, and date, MF was not fully oriented to her situation.  She explained that while MF did recall

crossing the street, MF said she had been going back and forth to her neighbor's home. And MF thought she had gone to the hospital for fertilizer poisoning. Ross added that MF's memory was "distorted by delusional thought content." RP at 8.

Ross also spoke about MF's treatment history before she was detained. She said that MF previously was receiving outpatient mental health treatment but had stopped going to appointments. Ross explained that MF canceled the intake or did not appear for the intake for six appointments. Ross added that MF's sister had tried to get MF connected to services.

On cross-examination, Ross confirmed that she had no information about whether MF risked being hit by cars while crossing the street back and forth. Ross also confirmed that MF owned a home, although the home was in foreclosure.

Ross testified that in her opinion, MF was gravely disabled based on her inability to make decisions for herself, inability to meet her own needs consistently, and history of not following through with voluntary outpatient treatment. She expressed concern that MF would experience further deterioration if she were discharged.

MF testified that she wanted to be released from the facility. She said she had been taking medications for anxiety and attention deficit disorder for many years, but she quit taking them about eight months ago. MF acknowledged that stopping her medications was a mistake that led to her detention. MF stated that she planned to live in her home when released. She named two organizations where she could get outpatient services and said that she would continue to see the primary care doctor she had been seeing for about 20 years. She also stated that she would take the medications the facility had prescribed until she could get her doctor's opinion.

At the conclusion of the evidence, the trial court stated that the commitment petition should be granted. The court stated, "I think you are probably well on the way out of here if you are acknowledging the trouble that you caused yourself by going off the medications and do agree to go back on." RP at 36-37. The court added that MF probably was "pretty close" to a less restrictive alternative to involuntary detention. RP at 37.

*Trial Court Order*

The trial court's order contained findings of fact and conclusions of law. The court listed MF's diagnosis as bipolar disorder with psychotic features and entered several findings based on Ross's testimony. The court found that there was no change between MF's evaluations; that MF thought she had been hospitalized for fertilizer poisoning; that MF had eaten food out of a garbage container; that MF displayed delusional thought content, disorganized thought processes, impaired memory, and impaired judgment and insight; and that MF second-guessed herself regarding her needs and needed frequent redirection from staff.

The trial court also entered findings that were favorable to MF. The court found that when MF was "not endangered by crossing [the] street repeatedly." Clerk's Papers (CP) at 19. The court found that MF "will engage in services on [an] outpatient basis." CP at 19. And the court found that MF saw the connection between her decision to stop taking medication and her detention, and that she would take her medications as prescribed.

The trial court found that, as a result of a behavioral health disorder, MF manifested "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over . . . her actions and [was] not receiving such care as [was]

essential for . . . her health or safety." CP at 19. The court concluded that MF was gravely disabled and ordered up to 14 days of detention for involuntary treatment.

MF appeals the trial court's 14-day involuntary commitment order.

## ANALYSIS

### A.    SUFFICIENCY OF FACTUAL FINDINGS

MF argues that the trial court's commitment order did not contain sufficient written findings. We disagree.

After a probable cause hearing determining whether a person should be involuntarily committed for 14 days, the trial court must enter written findings of fact and conclusions of law. MPR 2.4(b)(4); *In re Det. of A.F.*, 20 Wn. App. 2d 115, 123, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022). This requirement guarantees that the court "has fully and properly dealt with the issues in the case as well as fully informed the parties and reviewing courts as to the basis of the court's decision." *A.F.*, 20 Wn. App 2d at 123. The trial court's oral decision or statements in the record may supplement their written findings. *In re Det. of J.M.*, 20 Wn. App. 2d 734, 741, 501 P.3d 187, *review denied*, 199 Wn.2d 1014 (2022).

The trial court's findings " 'must be sufficiently specific to permit meaningful review.' " *A.F.*, 20 Wn. App. 2d at 123 (quoting *In re LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986)). The findings are sufficiently specific where they indicate the factual bases for the court's conclusions. *A.F.*, 20 Wn. App. 2d at 123. In addition, findings may be sufficient even if they are only implicit in the formal findings of fact. *Id.*

For example, in *A.F.*, this court held that a trial court's findings were sufficient where they "included summaries of the witness testimony, with the clear inference that the portions of

the testimony recited were found reliable by the trial court and supported its conclusion that AF was gravely disabled." 20 Wn. App. 2d at 124.

Here, the trial court's findings could have been more detailed, but they are sufficiently specific to permit meaningful review. Like the court in *A.F.*, the court summarized the witness testimony presented. This summary provided the basis for the court's conclusion that MF was gravely disabled.

B.      INVOLUNTARY COMMITMENT DECISION

MF argues that substantial evidence did not support the trial court's conclusion that MF was gravely disabled. We hold that the trial court erred because the court's findings of fact are inconsistent with the conclusion that MF was gravely disabled.

When reviewing a trial court's decision on involuntary commitment, we consider whether substantial evidence supports the court's findings of fact and whether those findings of fact support the court's conclusions of law and judgment. *A.F.*, 20 Wn. App. 2d at 125. We view the evidence in the light most favorable to the petitioner, and we do not disturb decisions "regarding witness credibility or the persuasiveness of the evidence." *Id.*

Former RCW 71.05.020(24) (2021) provides two definitions of grave disability. The second definition, at issue here, states that a person is gravely disabled if they manifest "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and [they are] not receiving such care as is essential for [their] health or safety." Former RCW 71.05.020(24)(b). At a probable cause hearing, the petitioner must prove grave disability by a preponderance of the evidence. Former RCW 71.05.240(4) (2021).

When a petitioner seeks to prove that a person is gravely disabled under former RCW 71.05.020(24)(b), they must present "recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208. They also must show "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for [their] health or safety." *Id.* This may involve a showing "that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *Id.* In addition, "the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." *Id.*

Here, MF testified that she would seek treatment and resume taking her medication once released. The trial court could have discounted this testimony by determining that MF's testimony was not credible. Instead, the court made findings of fact that MF would seek treatment and take her medications. The trial court could have found that MF faced harmful consequences if released. But the court made no such finding, and in fact found that the activity that resulted in MF's detention – crossing the street back and forth – did not endanger her.

The trial court's findings of fact regarding what MF would do when released are inconsistent with a showing that MF "would not receive, if released, such care as is essential for [their] health or safety." *LaBelle*, 107 Wn.2d at 208. The court found that MF would receive necessary treatment. And the court's findings of fact are inconsistent with a showing that "harmful consequences [are] likely to follow if involuntary treatment is not ordered." *Id.* The court made no finding regarding harmful consequences. And the court did not find that MF was "*unable*, because of severe deterioration of mental functioning, to make a rational decision with

respect to [her] need for treatment." *Id.* The court found that MF would make rational decisions regarding treatment.

We conclude that the trial court's findings of fact do not support the court's legal conclusion that MF was gravely disabled under former RCW 71.05.020(24)(b). Therefore, we hold that the trial court erred in entering the 14-day commitment order.

<div align="center">CONCLUSION</div>

We reverse the trial court's involuntary commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

I concur:

VELJACIC, J.

GLASGOW, C.J.— (concurrence/dissent) Although I agree that the trial court's findings were sufficient to permit meaningful review, I would conclude that substantial evidence supports the 14-day commitment order in light of the petitioner's preponderance burden of proof, our deferential standard of review, and the consideration, emphasized in *In re Detention of LaBelle*, 107 Wn.2d 196, 206-07, 728 P.2d 138 (1986), that allowing a period of commitment where the patient can stabilize can prevent a revolving door of release, deterioration, and recommitment. I would affirm the order for MF's 14-day commitment.

At a probable cause hearing for a 14-day commitment, the petitioner must prove grave disability only by a preponderance of the evidence, not the clear, cogent, and convincing evidence required for longer commitment periods. RCW 71.05.240(4)(a). On review, we "view the evidence in the light most favorable to the petitioner" seeking commitment, and we do not disturb decisions "regarding witness credibility or the persuasiveness of the evidence." *In re Detention of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022).

The second definition of grave disability, the one at issue here, states that a person is gravely disabled if they manifest "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and [they are] not receiving such care as is essential for [their] health or safety." RCW 71.05.020(24)(b)[1]. This definition permits the State to involuntarily treat "patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.'" *LaBelle*, 107 Wn.2d at 206 (quoting Mary

---

[1] We cite to the current version of the statute because the relevant language was the same at the time of MF's 14-day commitment.

L. Durham & John Q. La Fond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 YALE L. & POL'Y REV. 395, 410 (1985)). "The second definition of gravely disabled allows intervention before a mentally ill person decompensates and provides for continuity of care." *A.F.*, 20 Wn. App. 2d at 127.

Here, viewing the evidence in the light most favorable to the petitioners, I would hold that substantial evidence supports the commissioner's conclusion that MF was gravely disabled under RCW 71.05.020(24)(b). I would not second-guess the commissioner's judgment that, by a preponderance of the evidence, MF was gravely disabled where there is substantial evidence in the record to support that conclusion, even though there are also facts that weigh against it. Our standard of review is deferential, in part because the commissioner viewed the testimony and was in the best position to weigh conflicting evidence.

The record as a whole demonstrates that substantial evidence supports the commissioner's conclusion, by a preponderance of the evidence, that MF was gravely disabled. The petitioners presented recent proof that MF experienced a significant loss of cognitive and volitional control. MF had delusions about "being ascended" both shortly before and during her initial commitment. Verbatim Rep. of Proc. (VRP) at 7, 9. While hospitalized, MF continued to speak about being ascended, at one point saying that she needed to go home because, "God couldn't find her" at the facility. VRP at 9. When she saw a different patient receiving an injection, "she became fixated on . . . receiving that injection so she could be ascended." *Id.* Staff observed MF eating food from a garbage container and she asked for the food back after it was taken from her. Although MF remembered crossing the street back and forth, the mental health professional's testimony showed that MF did not recognize that this behavior led police to bring her to the hospital. Instead, she

believed she was hospitalized for fertilizer poisoning. The mental health professional further testified that MF was unable to make decisions for herself during her commitment.

The petitioners also showed a factual basis for concluding that, if released, MF would not receive the care essential for her health or safety. Although the commissioner found that MF would take her medications and seek outpatient treatment, we can infer from the commissioner's decision imposing a 14-day commitment that he also found MF's assurances did not guarantee she would receive the care she needed to ensure her safety. Even when on medication during her initial commitment, MF continued to experience delusions, becoming fixated on an injection she believed would lead to her ascension. At the probable cause hearing, the mental health professional testified that nothing about MF's presentation had changed in the five days constituting her initial commitment. MF was "not fully oriented to situation." VRP at 8. MF's memory was "distorted by delusional thought content," and MF would "provide conflicting information within a brief conversation." *Id.* While MF was "able to make her needs known" at the facility, she required staff to redirect her or assist her in meeting those needs. *Id.* The mental health professional expressed concern that MF would experience "further deterioration" if she were discharged. VRP at 13. Thus, substantial evidence supports the commissioner's ultimate conclusion that it was necessary to intervene and prevent MF's further decompensation in the community. *See A.F.*, 20 Wn. App. 2d at 127 (the second definition of gravely disabled allows intervention before a person with a mental illness decompensates).

Although MF testified about a plan for receiving treatment in the community, we can infer from the commissioner's ultimate decision that the commissioner did not believe MF's commitment to engage in outpatient treatment would be enough to keep her safe. The

No. 57590-6-II

commissioner's statement at the end of the probable cause hearing supports this inference. The commissioner told MF, "You are probably pretty close to a less restrictive [alternative] but I don't think it is there yet based on the testimony as I heard." VRP at 37.

When reviewing a commissioner's decision on involuntary commitment, we view the evidence in the light most favorable to the petitioners seeking commitment and we do not disturb the commissioner's "decision regarding witness credibility or the persuasiveness of the evidence." *A.F.*, 20 Wn. App. 2d at 125. In light of all of the evidence discussed above, there was substantial evidence in the record supporting the commissioner's conclusion that MF was nevertheless gravely disabled and a 14-day commitment was required to ensure her safety. As a result, I would hold that substantial evidence supports the commissioner's conclusion that MF was gravely disabled under RCW 71.05.020(24)(b), and I would affirm the decision to detain her for up to 14 days of involuntary treatment.

Glasgow, C.J.

12