IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of: | No. 86787-3-I |
| A.M. | DIVISION ONE |
| | UNPUBLISHED OPINION |

COBURN, J. — A.M. appeals the trial court's 14-day involuntary commitment order, arguing the findings of fact are insufficient for meaningful review. We disagree and affirm.

FACTS

On April 23, 2024, A.M. was arrested and detained at Snohomish County Jail after an incident where he was reportedly in the car with his grandmother and mother and became upset, trying to open the car door while the car was moving and hitting his grandmother when she tried to calm him down. A designated crisis responder evaluated A.M. in jail. A.M. was transferred to the Mukilteo Evaluation and Treatment facility (Mukilteo E&T) for further evaluation. On April 29, court evaluators, including licensed independent clinical social worker Deidra Parsinen,[1] petitioned to detain A.M. for 14 days of involuntary mental health treatment under chapter 71.05 RCW on the basis of

_____

[1] The record varies as to the spelling of Parsinen's first name. We use spelling consistent with the parties' briefing.

grave disability.

At a probable cause hearing on May 3, 2024, a court commissioner heard testimony from Parsinen as to A.M.'s mental status and related behavior. Prior to the hearing, Parsinen reviewed A.M.'s medical charts and records and spoke with A.M.'s mother. Parsinen testified that A.M. had prior and current diagnoses of schizophrenia, as well as "a history of hospitalizations for mental health treatment." A.M. had been prescribed medication for his behavioral health disorder, including for symptoms of psychosis and agitation.

When the designated crisis responder met with A.M. in jail, Parsinen testified that A.M. presented as disheveled with "wide eyes and [an] intense stare." He was pacing back and forth in his jail cell and pulling his hair. "[H]is speech was rambling and disorganized." A.M. said "his brain was freezing" and "warped," and that people were talking to him in his sleep. According to Parsinen's testimony, A.M. acknowledged that he had schizophrenia but denied taking medication for the condition.

Parsinen testified to A.M.'s concerning behavior while at the Mukilteo E&T facility, including A.M. responding to internal stimuli, expressing paranoia about his medications, acting aggressively, and banging his head on the wall. Parsinen also testified that Mukilteo E&T staff were ordered "to crush the med[ications] into apple sauce or pudding because [A.M.] ha[d] been cheeking his med[ications], meaning he puts his med[ications] inside his cheek but does not swallow them."

During his meeting with Parsinen the day before the hearing, A.M. became agitated, admitted to not taking his medications, and claimed he was not being given the medications he needed. He yelled he was constantly losing his mind and he could not

2

trust anyone. A.M. indicated he "did not have an idea" where he would go and "would be homeless" if discharged. Parsinen opined that A.M. "suffers from schizophrenia" and that A.M.'s symptoms or behaviors during his most recent hospitalization at Mukilteo E&T were closely associated with symptoms or behaviors that led to his past hospitalizations. She testified that because of A.M.'s behavioral health disorder of schizophrenia and related symptoms, he was gravely disabled and unable to provide for his own health and safety needs and thus was in danger of serious physical harm. Parsinen testified that A.M. had not been able to engage in a least restrictive discharge plan and opined that there were not any available or appropriate less restrictive alternatives.

At the conclusion of the hearing, the commissioner ordered A.M. to be committed for up to 14 days of involuntary treatment on the basis of grave disability under prong (a) of RCW 71.05.020(25).[2] A.M. appeals.[3]

## DISCUSSION

A.M. argues that the trial court's written findings of fact are inadequate for appellate review. We disagree.

Only under limited circumstances may an individual be committed against their will for mental health treatment under Washington's Involuntary Treatment Act (ITA), ch.

---

[2] An amended RCW 71.05.020 went into effect January 1, 2025, but because subsection 25 did not change from the applicable 2024 version, we cite to the current statute. LAWS OF 2024 ch. 62 § 18.

[3] Because an involuntary commitment order may have adverse collateral consequences on future involuntary commitment determinations, this case is not moot even though the commitment order has since expired. In re Det. of M.K., 168 Wn. App. 621, 629-30, 279 P.3d 897 (2012); In re L.T.S., 197 Wn. App. 230, 234, 389 P.3d 660 (2016); In re Det. of E.S., 22 Wn. App. 2d 161, 173-74, 509 P.3d 871 (2022); see also In re Det. of G.D., 11 Wn. App. 2d 67, 72-73, 450 P.3d 668 (2019) (reversing an involuntary commitment based on insufficiency of written findings).

71.05 RCW. See RCW 71.05.240; In re Det. of A.C., 1 Wn.3d 731, 735, 533 P.3d 81 (2023). If the trial court concludes after a probable cause hearing that the person "presents a likelihood of serious harm, or is gravely disabled" because of a behavioral health disorder and finds that less restrictive alternatives are not "in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed 14 days." RCW 71.05.240(4)(a). An individual is gravely disabled if as a result of a behavioral health disorder, the individual

> (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). We review a trial court's application of the ITA to a particular set of disputed facts for an abuse of discretion. A.C., 1 Wn.3d at 739. "[W]here the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

The court must make and enter written findings of fact and conclusions of law after an involuntary commitment hearing, except where the matter is tried to a jury. Id. at 218; MPR 3.4(b). A trial court's written findings of fact "must be sufficiently specific to permit meaningful review." LaBelle, 107 Wn.2d at 218. "While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions." Id. The purpose of this requirement is to ensure that the trial court has properly

4

addressed all issues and that the parties and the appellate court may be fully informed of the grounds for the decision. Id. at 218-19. A trial court is only required to make findings of fact on matters that "establish the existence or nonexistence of determinative factual matters," and not on all matters supported by the record. Id. at 219.

"Findings may be sufficient even if they are implicit in the trial court's formal written findings of fact." In re Det. of A.F., 20 Wn. App. 2d 115, 123, 498 P.3d 1006 (2021). "[W]ritten findings may be supplemented by the trial court's oral decision or statements in the record." LaBelle, 107 Wn.2d at 219. However, general findings based on boilerplate statutory language, without more, are insufficient to permit meaningful appellate review. Id. at 218-19. "Merely checking the boxes of a standardized order without making any additional findings is not sufficient." In re Det. of J.M., 20 Wn. App. 2d 734, 741, 501 P.3d 187 (2022); see, e.g., In re Det. of G.D., 11 Wn. App. 2d 67, 70, 72-73, 450 P.3d 668 (2019) (concluding that trial court's boilerplate "check-the-box" finding that G.D., as a result of a mental disorder, presented a likelihood of serious harm to himself was insufficiently specific under LaBelle).

In the instant case the trial court stated in its written order that it found A.M. was gravely disabled under RCW 71.05.020(25)(a) based on the facts that A.M. suffered from the specific condition of schizophrenia and that, because of his behavioral health disorder, he was in danger of "serious physical harm of self." The findings thus consist of more than merely preprinted checkboxes or generalized statutory language. Contrary to A.M.'s claims that the findings are impermissibly "non-specific" and "conclusory," the trial court's order particularly identified Parsinen's testimony as factual support for its conclusion that A.M. was gravely disabled. The court observed that although A.M. made

some improvement during his hospitalization at Mukilteo E&T, he presented "ongoing agitation" the day before the hearing. The trial court also stated that "a least restrictive alternative … is not appropriate because [of A.M.'s] inability to engage in discharge planning." See A.F., 20 Wn. App. 2d at 124 (determining written findings were sufficient where trial court summarized portions of witness testimony and indicated specific diagnoses to provide factual basis for its grave disability conclusion).

To the extent that A.M. complains about the trial court's failure to make credibility findings, it is plain to us that the trial court's reliance on Parsinen's testimony implies findings of credibility and reliability.[4] See id. While the court, as A.M. suggests, could have made more specific findings, the question before us is whether the court's findings are sufficiently specific to permit meaningful review. J.M., 20 Wn. App. 2d at 742. We hold that they are. A.M. does not otherwise argue that the court's finding of grave disability was based on insufficient evidence.

Affirmed.

_Coburn, J._

WE CONCUR:

_Chung, J._          _Mann, J._

---

[4] We note, however, that "[i]f the trial court chooses to summarize the testimony of a witness, the best practice is to clearly articulate whether the court found that testimony credible." State v. Coleman, 6 Wn. App. 2d 507, 516 n.40, 431 P.3d 514 (2018).