**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of<br><br>D.W. | No. 88044-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — The superior court ordered D.W. committed for 14 day involuntary treatment. D.W. appeals the order, arguing that there was not substantial evidence to support the superior court's finding that he was gravely disabled and that a less restrictive alternative treatment would not be in his best interests. Because substantial evidence supports the superior court's findings, we affirm.

I

On March 17, 2025, a King County sheriff brought D.W. into the Multicare Auburn emergency room because he was allegedly suffering from a behavioral health disorder that allegedly made him a danger to others and unable to care for himself. On March 18, a designated crisis responder filed a petition for D.W.'s initial detention. On March 21, medical providers at Fairfax Hospital petitioned for D.W. to be detained for 14 day involuntary treatment. The superior court held a hearing to decide the petition on March 25. Three witnesses testified at D.W.'s

commitment hearing, Dr. Bethany O'Neill, a psychologist, court evaluator, and proxy witness for MultiCare Hospital; Brian Hayden, a court services manager and court evaluator for Fairfax Community Behavioral Health; and D.W. Based on the testimony of the three witnesses, the court found that D.W. was gravely disabled under prong (a), that, as a result of a behavioral health disorder, he was in danger of serious physical harm due to an inability to provide for his essential needs of health and safety, and that a less restrictive alternative treatment was not in his best interest. We discuss D.W.'s specific challenges to the evidence below.

II

In reviewing the superior court's involuntary commitment order we consider whether the findings of fact are supported by substantial evidence and if those findings support the court's conclusions of law. In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024), review denied, No. 103607-8 (Wash. Nov. 20, 2025). " 'Substantial evidence' is a quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise." Id. (quoting In re Det. of A.F., 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021)). In considering whether there was sufficient evidence, we review the evidence in the light most favorable to the petitioner. Id. An appeal from an order of commitment is not moot, even after the commitment period is ended, because "each commitment order has a collateral consequence in subsequent petitions and hearings." In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012).

Involuntary commitment for behavioral health disorders "is a significant deprivation of liberty" that requires "due process of law." In re Det. of LaBelle, 107

Wn.2d 196, 201, 728 P.2d 138 (1986). "In general, an individual may be involuntarily committed for mental health treatment if, as a result of a mental disorder, the individual either (1) poses a substantial risk of harm to him or herself, others, or the property of others, or (2) is gravely disabled." M.K., 168 Wn. App. at 630. Here, the superior court ordered D.W.'s commitment after finding him gravely disabled. If, at the conclusion of the probable cause hearing, the court finds by a preponderance of the evidence that "as the result of a behavioral health disorder" the individual is "gravely disabled," the court must consider less restrictive alternatives to involuntary detention, but if finding that no such alternatives are in the best interest of the individual, the court "shall order that such person be detained for involuntary treatment not to exceed 14 days." RCW 71.05.240(4).[1]

RCW 71.05.020(25) provides for two definitions of gravely disabled. The superior court relied only on "prong (a)." An individual is gravely disabled under prong (a) if "as a result of a behavioral health disorder" they are "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(25)(a).

> In order to avoid the erroneous commitment of such persons under the gravely disabled standard, the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown

---

[1] A "less restrictive alternative treatment" is a program of "individualized treatment in a less restrictive setting than inpatient treatment." RCW 71.05.020(35).

to arise as a result of mental disorder and not because of other factors.

LaBelle, 107 Wn.2d at 204-05. These strict requirements are to mitigate the "danger of imposing majoritarian values on a person's chosen lifestyle which, although not sufficiently harmful to justify commitment, may be perceived by most of society as eccentric, substandard, or otherwise offensive." Id. at 204. "Although uncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital," evidence supported involuntary treatment where it indicated that LaBelle's "plans to live on the streets are not the result of a choice of lifestyle but rather a result of his deteriorated condition which rendered him unable to make a rational choice with respect to his ability to care for his essential needs." Id. at 210.

The superior court found the testimony of Dr. O'Neill and Hayden credible. In Hayden's opinion, D.W. was gravely disabled under prong (a) and a less restrictive alternative treatment was not in D.W.'s best interests. In forming his opinion, Hayden relied on hospital records, consultation with D.W.'s treatment team, his own interview with D.W., his own observations of D.W., and Dr. O'Neill's testimony. D.W. objected to much of the evidence presented at the commitment hearing as hearsay, and for those objections, which the court sustained, the court admitted the evidence as basis evidence for the limited purpose of informing the expert's opinion. See ER 703; In re Det. of L.S., 23 Wn. App. 2d 672, 681, 517 P.3d 490 (2022) (expert opinion is considered evidence and otherwise inadmissible evidence may be admissible to explain basis of opinion).

First, there was evidence that D.W. suffered from bipolar disorder, as shown by his delusional thinking, pressured speech, irritability, and impaired impulse control. Hayden testified that the working diagnosis for D.W.'s behavioral health disorder was bipolar disorder type 1 currently manic with psychotic features. The effects of D.W.'s behavioral health disorder were shown through testimony that D.W. was hyperverbal, expressed grandiose delusions, showed impaired impulse control, lacked insight, did not respect boundaries, and exhibited agitation and irritability. D.W. regularly claimed that he was a famous and wealthy comedian. He offered Hayden "$500 billion" if he could get D.W. out of the hospital.

Hayden relied on a progress note stating that D.W. claimed he owned the hospital he was staying in and that he was going to build an airport and shopping center on the property. D.W. also claimed that he was going to have the senior center that he had been living in "destroyed and moved about 100 feet and built better." D.W. showed irritability and impaired impulse control through his treatment of his peers. Hayden relied on a progress note stating that D.W. made inappropriate comments toward female patients and staff, and he touched another patient on the arm despite being told not to. The note continued, when hospital staff told him not to touch people, D.W. replied to the staff member with an expletive and said he "would do it when staff wasn't looking." In another progress note relied on by Hayden, D.W. grazed the shoulder of a patient who told him, " 'Don't touch me, you pedophile,' " to which D.W. replied, while giggling, " 'I am a pedophile.' " Staff regularly had to redirect D.W.

Second, there was substantial evidence that D.W. was in danger of serious physical harm due to his inability to provide for his essential needs. Hayden relied on notes and testimony showing that D.W. denied his symptoms and denied the events that led to his hospitalization, that D.W. regularly showed poor activities of daily living, and that D.W. had trouble sleeping (which he denied), sometimes sleeping less than two hours at night. Dr. O'Neill and Hayden relied on evidence purportedly showing D.W.'s inconsistent and intermittent medication use. D.W. struggled to pay for one medication, which was not covered by Medicare, but when asked if he had done anything to get help with paying for the medication, he replied, "I don't know how."

There was evidence that D.W. was not eating enough. Hayden referred to D.W.'s body mass index (BMI) as "extremely low," relying on a nursing assessment that described D.W. as looking malnourished, and that listed D.W.'s BMI as 15.5, while the bottom end of the normal range is 19. Additionally, Dr. O'Neill relied on a report showing that there were ketones present in D.W.'s urine. Ketones in urine are a "sign of malnutrition" and "indicative of someone not eating appropriately." Hayden's opinion that D.W. was unable to care for himself was further bolstered by evidence that hospital staff ordered a high protein diet, double portion due to D.W.'s low weight and poor nutrition, that D.W. was 74 years old, and that D.W. told Hayden that he was being evicted. When Hayden asked D.W. how he would meet his needs in the face of eviction, D.W. was unable to explain how he would secure food, clothing, or shelter. And there was evidence that D.W.'s condition was progressively deteriorating, as D.W. went from calm, cooperative, and not

6

showing "advanced symptoms" in February to his sleepless, delusional, malnourished, and irritable state in March.[2]

D.W. asserts that "any risk of physical harm was due not to D.W.'s mental health impairment—which D.W. had managed for decades—but to the exorbitant cost of his medications." D.W.'s argument is based on his testimony that he was living on $3,000 a month and was unable to pay for sertraline, which he said cost $375 a month. Asked by the court, "It sounds like you're having a problem paying for your medication in the community; is that right?" D.W. replied, "Just one. Medicare and my insurance co-pay [UNINTELLIGIBLE] for additional ones. It pays for everything else, but they will not pay for that." The court asked, "Have you done anything to get help with that?" And D.W. replied, "I don't know how." Other evidence suggested that D.W. may have voluntarily discontinued use of sertraline more than a year before the commitment hearing because he "got better."

The record was otherwise undeveloped on the potential barriers D.W. faced in obtaining mental healthcare or potential means to overcome them. LaBelle supports that the mere inability to afford necessary care without more could not justify involuntary treatment. See 107 Wn.2d at 210. Here, however, there was evidence that, as a result of his working bipolar diagnosis, and at the age of 74, D.W. was delusional, irritable, showed poor impulse control and poor boundaries, had decompensated within the last month, was unable to rationally plan to meet

---

[2] Dr. O'Neill relied on evidence for her expert opinion purporting to show D.W.'s condition over two hospital visits on February 10 and February 21, 2025. Allegedly, D.W.'s first visit was because he fell while drawing a bath. And purportedly, in his second visit D.W. was wearing somewhat dirty clothes, though not soiled, he was alert and oriented, and was released without safety concerns.

his needs in the community, and was acutely malnourished. There was tangible evidence of an imminent and serious risk of physical harm to D.W.

In its oral ruling, the superior court found that D.W. was not "taking in enough water to sustain himself in the community." D.W. contends that this finding is not supported by substantial evidence. D.W. is correct, the finding is not supported by substantial evidence. Setting aside the superior court's finding on D.W.'s water intake and only considering those findings supported by substantial evidence, the superior court's conclusion that, because of D.W.'s behavioral health disorder, D.W. was in danger of serious physical harm due to his inability to provide for his essential needs is supported.

D.W. argues that substantial evidence did not support the finding that a less restrictive alternative treatment was not in his best interests. There was evidence that D.W. had been evicted. In its oral ruling the court acknowledged that homelessness was not in and of itself a negative consequence that it was concerned with, but that because of D.W.'s age, health, and impaired ability to act appropriately with others, the court anticipated a likely medical emergency or law enforcement contact that would send D.W. back to the hospital for inpatient treatment. Counsel asked Hayden what harmful consequences he foresaw if D.W. did not receive inpatient treatment, and Hayden replied, "Not to be hyperbolic, but the concern is that he will die from his inability to care for himself; that he will not seek appropriate care now; that he will not be able to feed himself or find shelter for himself; and that this will lead to his death."

8

At the hearing, D.W. did not argue that petitioners had failed to meet their burden of showing that a less restrictive alternative treatment was not available. The only testimony on the issue was Hayden's, which the superior court was entitled to believe. There was substantial evidence to support the court's conclusion that less restrictive alternative treatment was not in D.W.'s best interests.

Affirmed.

_Birk, J._

WE CONCUR:

_Mann, J._