**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of:<br><br>C-H.G.,<br><br>Appellant. | No. 85016-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — C-H.G. appeals an order committing her involuntarily for 14 days under the Involuntary Treatment Act (ITA), ch. 71.05 RCW. We affirm.

I

In January 2023, a designated crisis responder (DCR) petitioned to have C-H.G. detained for inpatient evaluation and treatment. According to the petition, C-H.G.'s daughter reported that C-H.G., who had been involuntarily hospitalized before, had stopped taking her medications, had destroyed her husband's laptop because she thought he was cheating on her, had threatened to tell law enforcement that her husband had "raped everyone in the house and . . . [was] a pedophile," interfered with family members' medical treatment, was not sleeping at night and would sing at the top of her lungs for hours, believed the government was stalking her and her family poisoning her, drove with her eyes closed, and "talk[ed] to God" on the phone. The DCR declared that C-H.G. "presented with pressured speech, an angry tone,

suspiciousness, paranoia, illogical thought process and a labile affect," "deflected issues to her family," did not believe she needed treatment, and said she was " 'sending messages to churches that is above the state level' but could not explain further." The DCR attested that C-H.G.'s behaviors "represent a worsening, marked and concerning change in her baseline behavior" and that "as a result of a behavioral health disorder [C-H.G.] presents a likelihood of serious harm to . . . herself, others, or to the property of others, and/or that [she] is gravely disabled." The trial court granted the petition for initial detention, and C-H.G. was admitted to Navos Inpatient Services (Navos).

On January 12, Navos petitioned for a 14-day involuntary commitment order. A hearing was held in early February. C-H.G. and her daughter T.G. each testified, as did Michelle Mang, a Navos mental health counselor who evaluated C-H.G. and reviewed her medical chart. At the close of the hearing, the trial court found that C-H.G. was "gravely disabled" as defined in the ITA and ordered that C-H.G. be detained for 14 days of involuntary treatment. C-H.G. appeals.

II

C-H.G. argues that the evidence was insufficient to support the 14-day involuntary commitment order. We disagree.

The ITA authorizes a trial court to commit a person for up to 14 days if the court finds by a preponderance of the evidence that the person is, as relevant here, "gravely disabled." RCW 71.05.240(4)(a). On review, we determine whether substantial evidence supports the trial court's findings and, if so, whether those findings support its conclusion of law and judgment. In re Det. of A.F., 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). "Substantial evidence is the quantum of evidence sufficient to persuade a

fair-minded person of the truth of the declared premise." In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015).

Here, the trial court found that C-H.G. was "gravely disabled" under former RCW 71.05.020(24)(b) (2022), or "Prong B," which provides that a person is "gravely disabled" if that person, "as a result of a behavioral health disorder[,] . . . manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."

C-H.G. first argues this was error because in the days leading up to the commitment hearing, she was showing "increased control," and thus the evidence did not show "escalating loss" of cognitive or volitional control. But while there was evidence that C-H.G. was improving in the days before the hearing due to her resuming medication, there was also evidence that she remained far from baseline. T.G. testified that when C-H.G. was her "normal self," she was happy, fully functioning, and a good communicator, and although she would fast once in a while, she would regularly eat "a couple of meals a day." She testified that at her baseline, C-H.G. would sleep regularly and had "[v]ery good" hygiene. But T.G. also testified that as recently as two or three days before the commitment hearing, C-H.G. sounded angry, had disorganized speech, "and her sentences were not completely understandable," and that these behaviors had also been precursors to her initial decompensation. Progress notes from C-H.G.'s chart at Navos showed that she frequently missed meals, did not sleep regularly, and did not care for her hygiene. She was drinking excessive amounts of water, indicating that she wanted to "flush out her system because of the[ ] poisons that she believes are in her

body from the government and from others." Mang diagnosed C-H.G. with schizophrenia and opined that C-H.G. was gravely disabled as a result of her schizophrenia. Although Mang acknowledged that C-H.G.'s sleep, hygiene, and dietary habits had improved since she resumed taking medication, she also testified that C-H.G. was still exhibiting "active symptoms" as well as "increasing paranoia and delusions." The record supports the trial court's determination that as a result of her schizophrenia, C-H.G. "manifest[ed] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over . . . her actions." See former RCW 71.05.020(24)(b). While C-H.G. relies on general principles stated In re Detention of LaBelle to argue otherwise, even LaBelle rejected the notion that a person must be released merely if their condition has improved. 107 Wn.2d 196, 207, 728 P.2d 138 (1986) ("It would . . . result in absurd and potentially harmful consequences[ ] for a court [to] be required to release a person whose condition, as a result of the initial commitment, has stabilized or improved minimally—i.e., is no longer 'escalating'—even though that person otherwise manifests severe deterioration in routine functioning and, if released, would not receive such care as is essential for his or her health or safety.").

C-H.G. next points out that to show C-H.G. was "not receiving such care as is essential for . . . her health or safety" as required under the second part of former RCW 71.05.020(24)(b), the evidence had to show that C-H.G. was "*unable,* because of severe deterioration in mental functioning, to make a rational decision with respect to [the] need for treatment." LaBelle, 107 Wn.2d at 208. C-H.G. claims she testified that

she planned to continue taking her medication if released and that she was not opposed to continuing treatment in the community.

But although C-H.G. testified that she would take her medications upon release, her testimony was equivocal: she also stated that she did not think she needed medication and believed it was "not a coincidence" that "deadly side effects [of the medication] happen[ ] to [her] family." C-H.G.'s chart notes reflected that she consistently stated throughout her initial detention that her medications were poisoning her, denied any mental illness, and indicated she was not willing to go to counseling or continue taking medication once released. Additionally, T.G. testified that C-H.G. had stopped taking her medications before. When asked whether she would go to outpatient treatment, C-H.G. did not provide a direct answer, instead stating that it would be "kind of hard" because she had "a very old car." And Mang testified that C-H.G. "does not have any insight" into her need for treatment and "ha[d] not been receptive" to "multiple attempts to talk with her about outpatient services for psychiatry, as well as counseling." The evidence amply supported the trial court's finding that the second part of Prong B was satisfied. Cf. In re Det. of A.M., 17 Wn. App. 2d 321, 336, 487 P.3d 531 (2021) (substantial evidence supported a finding that detainee would not receive care that was essential for his health or safety if released where a provider testified that the detainee "had no insight into his mental illness, . . . did not believe that he needed any medication[, and] had 'a history of noncompliance with medication in the community' ").

In sum, substantial evidence supports the trial court's determination that C-H.G. was gravely disabled under Prong B.

No. 85016-4-I/6

Affirmed.

_____ Mann, J.

WE CONCUR:

_____ Chung, J.

_____ Brennan, J.

-6-