# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No.58861-7-II |
| J.B. | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – JB appeals a trial court order involuntarily committing him to Western State Hospital (WSH) for up to 180 days for inpatient treatment. He argues that substantial evidence does not support the trial court's findings that (1) he was gravely disabled and (2) a less restrictive alternative to WSH was not in his best interests. We hold that the evidence was sufficient to support the trial court's findings. Therefore, we affirm the trial court's commitment order.

## FACTS

*Background*

JB has been at WSH, a psychiatric hospital, for almost 35 years. He was admitted in 1988 for an evaluation of his competency after he was charged with first degree murder for killing his father. JB believed that his father had sold him into prostitution to pay off a debt to a mafia crime family in New York City. The charge was dismissed because he did not regain competency and he was civilly committed as a danger to others. JB has been recommitted continuously every 180 days since then.

In September 2023, a mental health professional and a physician from WSH sought JB's involuntary treatment for an additional 180 days under the involuntary treatment act (ITA), chapter 71.05 RCW. The petition alleged that JB was gravely disabled.

*Commitment Hearing Testimony*

Dr. Elwyn Hulse, JB's psychologist at WSH, treated JB for the last three and a half years. Dr. Hulse evaluated and diagnosed JB with schizophrenia, continuous. When Dr. Hulse tried to evaluate JB's mental status, JB invoked his legal rights and declined to be interviewed.

For six months, Dr. Hulse observed JB displaying "continued disorganized behavior, continued delusions that are grandiose, persecutory, and somatic in nature, and a steady decline in self-care on a daily basis." Rep. of Proc. (RP) at 8. Dr. Hulse described JB's delusions as including JB never being free, his father selling him into sex trafficking to a New York City crime family at 10 months old, and either his father, the crime family or a third man as always controlling him. In addition, JB believed that in 1986 surgeons removed his intestines because he did not have money to pay them and he now wanted replacement intestines. Finally, he had made frequent calls to the FBI over the previous four months.

Dr. Hulse stated that JB did not believe that he had a mental illness and that he "rejects all outside information that contradicts any of his delusional thoughts," which inhibits his ability to have insight. RP at 9-10, 13. In addition, JB had impaired judgment and perception because of his behavioral health disorder. JB had "extreme deficits in social cognition" and stated to the staff that he has killed and would kill again. RP at 10.

In his professional opinion, Dr. Hulse testified that he did not believe JB could consistently ensure that his basic health and safety needs would be met and that JB would be at risk of serious physical harm if he were released from WSH. JB had not taken any antipsychotic

medications for nine months and he refused to take a shower unless he was paid a million dollars. In addition, JB had a basal cell carcinoma on his back that he refused to let people treat.

There had been periods of time where JB took his antipsychotic medication where he almost was discharged. But Dr. Hulse testified that once JB's guardian tried to discuss placement options, JB disengaged from the process.

Dr. Hulse stated that JB spent most of his time in the last four months calling the FBI and writing long letters where his thoughts were "disorganized, psychotic, and delusional." RP at 12. Dr. Hulse assessed JB as being driven almost entirely by his "psychotic preoccupations" and that JB was not capable of making rational decisions regarding his treatment. RP at 12-13.

Dr. Hulse recommended for JB to continue treatment at WSH and that it was necessary for JB to remain there because "the community would not be safe with him present without any structure or supervision, and he would be allowed to continue his . . . negative downward spiral." RP at 13-14. Dr. Hulse did not recommend a less restrictive alternative to hospitalization. And when asked what improvements JB would need to show for consideration of such an alternative, Dr. Hulse stated that JB would need to resume his antipsychotic medication and "actively participate in discharge planning to an adult family home." RP at 14.

JB also testified. He stated that he wanted "[f]reedom from the hospital, freedom from the mafia, and freedom on the outside, a civilian." RP at 18. JB testified that if released from the hospital, within 60 days he would have an apartment paid with money that his father gave him. He would stay voluntarily at the hospital until he had the apartment.

Once JB's attorney was done asking him questions, JB had additional information that he wanted the trial court to know against his attorney's advice. The trial court asked JB whether he understand that anything he said could potentially be used against him, to which JB responded,

3

"Yeah." RP at 19-20. JB then proceeded to make rambling, delusional statements before his counsel cut him off and rested.

*Findings of Fact and Conclusions of Law*

Following the hearing, the trial court entered findings of fact and conclusions of law. The court found that JB suffered from schizophrenia, continuous and that JB was/continued to be gravely disabled. Specifically, the court found that "as a result of a behavioral health disorder [JB] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, [and] is not receiving such care as is essential for health and safety." Clerk's Papers (CP) at 40. The court relied on Dr. Hulse's and JB's testimony to support its findings.

The trial court also found that less restrictive alternatives to involuntary commitment were not in the best interests of JB or others. The court ordered JB to continue treatment at WSH for up to 180 days.

JB appeals the trial court's involuntary commitment order.

ANALYSIS

A.    STANDARD OF REVIEW

When reviewing a trial court's decision on involuntary commitment for sufficient evidence, we consider whether substantial evidence supports the court's findings of fact and whether those findings of fact support the conclusions of law and judgment. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). " 'Substantial evidence[] is the quantum of evidence sufficient to persuade a fair-minded person.' " *Id.* (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). We view the evidence in the light most favorable to the

petitioner, and we do not disturb witness credibility determinations or the trial court's evaluation of the persuasiveness of evidence. *A.F.*, 20 Wn. App. 2d at 125.

B.      LEGAL PRINCIPLES

RCW 71.05.320(4) states that the person in charge of the facility in which a person is committed may file a new petition for involuntary treatment on various grounds. Relevant here, a person may be involuntarily recommitted for up to an additional 180 days if he or she continues to be gravely disabled. RCW 71.05.320(4)(d).

RCW 71.05.020(25) defines "gravely disabled" as a condition in which a person, due to a behavioral health disorder,

> (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

The trial court found JB gravely disabled under RCW 71.05.020(25)(b).

In a civil commitment proceeding, the State has the burden of proving that a person is gravely disabled or presents a likelihood of serious harm by clear, cogent, and convincing evidence. RCW 71.05.310. This standard means that the State must show that the ultimate fact in issue is "highly probable." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

When a petitioner seeks to prove that a person is gravely disabled under RCW 71.05.020(25)(b), they must show (1) "recent proof of significant loss of cognitive or volitional control" and (2) "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for [their] health or safety." *LaBelle*, 107 Wn.2d at 208. The second requirement may include a showing that "the individual is unable, because of

severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *Id.* (emphasis omitted).

RCW 71.05.320(1)(a) provides that, if the trial court finds a person to be gravely disabled, it also must determine "that the best interests of the person or others will not be served by a less restrictive treatment which is an alternative to detention" before ordering involuntary commitment. The statute empowers the trial court "to determine the best interests of the individual and in so doing, to consider less restrictive treatment." *In re Det. of J.S.*, 124 Wn.2d 689, 699, 880 P.2d 976 (1994). The State has the burden of proving that a less restrictive alternative is not in the best interests of the person to be committed. *In re Det. of T.A.H.-L.*, 123 Wn. App. 172, 186, 97 P.3d 767 (2004).

C.      GRAVELY DISABLED FINDING

JB argues that the State failed to prove that he was gravely disabled under RCW 71.05.020(25)(b). We disagree.

Here, the trial court found that JB had a behavioral health disorder. Dr. Hulse provided the diagnosis and testified that JB had continued disorganized thinking and behavior, grandiose, persecutory and somatic delusions, and a steady decline in daily self-care. The trial court observed evidence of JB's disorder in court during his testimony.

The trial court also found that as a result of his behavioral health disorder, JB showed a significant loss of cognitive and volitional control. This finding was supported by Dr. Hulse's testimony that JB believed that he was sold into sex trafficking at a young age, that three surgeons removed his intestines, and JB frequently had been calling the FBI. Dr. Hulse also testified that JB rejected any information that contradicted his beliefs and that JB stated to staff

that he has killed and would kill again. And JB's own testimony reflected a loss of volitional control.

In addition, the trial court found that JB was not receiving care that was essential for his health and safety. Dr. Hulse testified that JB did not believe he had a mental illness and that JB had not taken any antipsychotic medications for the last nine months, refused to participate in treatment, refused to shower, and refused to get medical treatment for his basal cell carcinoma.

These factual findings support the trial court's determination that JB was gravely disabled. JB's refusal of medication and medical treatment, and his refusal to partake in basic hygiene showed that involuntary commitment was essential for JB's health and safety. In addition, JB's disorganized thinking and beliefs also supported that he could not care for himself. His deterioration of mental functioning prevented him from making rational decisions regarding his treatment.

Accordingly, we hold that the State presented substantial evidence to support the trial court's finding by clear, cogent and convincing evidence that JB was gravely disabled under RCW 71.05.020(25)(b).

C.    LESS RESTRICTIVE ALTERNATIVE

JB argues that the trial court erred in finding that a less restrictive alternative to involuntary commitment would not be in his best interests. We disagree.

Although "RCW 71.05 guarantees that less restrictive treatment for involuntarily detained individuals will be *considered*, . . . it does not expressly grant them a [statutory] *right* to less restrictive treatment." *J.S.*, 124 Wn.2d at 701 (emphasis added). Further, a person is not entitled to treatment in a less restrictive setting when continued treatment is "amply supported by professional judgment." *Id.*

7

Here, the trial court found that less restrictive alternative treatment was not in the best interests of JB or others. At the commitment hearing, Dr. Hulse did not recommend a less restrictive alternative and testified that it was necessary for JB to continue treatment at WSH for the health and safety of himself and others. JB rejected "all outside information that contradict[ed] any of his delusional thoughts" and JB had impaired judgment and perception because of his behavioral health disorder. RP at 9-10. He had "extreme deficits in social cognition" and stated to the staff that he had killed and would kill again. RP at 10.

Dr. Hulse did not believe that JB could consistently ensure that his basic health and safety needs would be met and that JB would be at risk of serious physical harm if he were released from the hospital. Dr. Hulse stated that in order to consider a less restrictive alternative, JB would need to resume his antipsychotic medication and actively participate in discharge planning.

JB contends that the trial court was required to find that care at WSH was essential to his health and safety. However, as stated above, substantial evidence supported the trial court's finding that JB's severe deterioration in routine functioning was causing him to not receive care that was essential for his health and safety.

Therefore, we hold that the trial court did not err in finding that a less restrictive alternative to commitment would not be in JB's best interests.

## CONCLUSION

We affirm the trial court's 180-day involuntary commitment order.

No. 58861-7-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

CRUSER, C.J.

VELJACIC, J.