IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>M.F. | No. 86644-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Designated crisis responders detained M.F. at Harborview Medical Center after she self-presented with back pain and suicidal ideation. Detained under Washington's involuntary treatment act (ITA), the court transferred M.F. to Fairfax Behavioral Health (Fairfax) for a 120-hour hold. Treatment providers at Fairfax then petitioned for an additional 14 days of inpatient treatment.

Following a probable cause hearing, the trial court found M.F. to be gravely disabled as a result of psychosis. M.F. appeals, asserting there was insufficient evidence to support the determination that she was gravely disabled and that the disability stems from a mental health disorder. She also contends that unconscious racial bias impacted the trial court's analysis. Finding no error, we affirm.

FACTS

Background

M.F. self-presented at Harborview Medical Center (Harborview) for back pain and suicidal ideation in April 2024.  She informed hospital staff that she planned to jump in front of a moving car.  M.F. also exhibited symptoms of psychosis, such as rapid and pressured speech, labile mood swings, and tangential thought patterns.

Shortly after her admission to Harborview, M.F. tested positive for syphilis.  A medical record review displayed that M.F. had been diagnosed with syphilis eight months prior.  Notes from that visit also showed that providers had discharged her with antipsychotic medication.

Because M.F. is allergic to penicillin, the usual first-choice medication for syphilis treatment, the evaluating physician recommended that M.F. undergo penicillin desensitization before taking any oral medication.  Penicillin desensitization is a complex procedure that requires admission to an intensive care unit (ICU).  When offered this treatment plan, M.F. struggled to repeat the information back to the provider and displayed further disorientation.

Concerned that she would be unable to maintain an oral medication regimen because of her "psychiatric decompensation," and noting the high morbidity risk untreated syphilis carries, the physician determined M.F. required psychiatric admission and referred her to a designated crisis responder (DCR). The DCR reviewed the medical notes, found M.F. to be in "imminent danger due to grave disability" resulting from a behavioral health disorder, and detained M.F.

for an emergency involuntary 120-hour treatment hold. Harborview transferred M.F. to Fairfax Behavioral Health (Fairfax) to begin treatment.

## Involuntary Treatment

Once transferred to Fairfax, M.F. continued to present with volatile mood swings, impulsive behavior, paranoia, and delusions. Although M.F. was consistently medication compliant, she did not engage in group therapy and struggled with boundaries with other patients. Evaluations regularly determined that her orientation, insight, and judgment were impaired. She did not acknowledge her psychiatric symptoms or any need for treatment.

Considering M.F.'s symptoms, treatment providers at Fairfax petitioned for up to an additional 14 days of inpatient treatment under RCW 71.05.230.

## Probable Cause Hearing

As required by statute, the trial court held a probable cause hearing on the 14-day petition. Fairfax presented three witnesses: a records custodian from Harborview, a physician as a medical witness, and an ITA court evaluator. None of the witnesses worked directly with M.F.

The first witness, Martin Buccieri, read M.F.'s initial Harborview assessment notes into the record. These notes documented the need for the initial involuntary hold, including the staff's observations of M.F.'s agitation, mood swings, and suicidal ideation, as well as her original syphilis diagnosis and her lack of compliance with outpatient treatment.

Dr. Eric Roedel, acting as the medical witness, then testified to his primary concerns about M.F.'s condition moving forward. Dr. Roedel detailed the high

morbidity of untreated syphilis, as well as the risk that M.F. would lose her penicillin desensitization if she were to miss a treatment, even by a matter of days. Noting that M.F. had already lived for eight months with untreated syphilis, he expressed concern for her ability to manage her health without professional intervention. Although Dr. Roedel did not provide an opinion as to why M.F. had not treated her syphilis in the previous months, he did testify that her psychiatric symptoms placed her at high risk for noncompliance with treatment recommendations.

Lastly, Anita Vallee, Fairfax's ITA court evaluator, testified that M.F. had a working diagnosis of unspecified psychosis. Recounting M.F.'s behavior while in treatment, Vallee stated that the hospital was primarily concerned with her inability to manage her syphilis independently as a result of psychiatric symptoms. Vallee testified that, based on the review of medical records, consultation with treatment providers, and the testimony of other witnesses, M.F. was gravely disabled under RCW 71.05.020(25).

M.F. also testified at the hearing and was able to recount her treatment plan and how she planned to meet it. But M.F. described herself as "kind of out of it" when she struggled to answer questions on cross-examination.

At the close of arguments, the trial court found that M.F. was gravely disabled as the result of a behavioral health disorder and that she was in danger of serious physical harm resulting from her failure to provide for her own health and safety. The court specifically addressed the evidence it relied on to do so, noting that the record demonstrated M.F.'s disorganization, agitation, and

4

inability to engage in discharge planning. The court then found that a less restrictive alternative would not be appropriate given the record and granted Fairfax's petition for up to 14 days of continued treatment.

M.F. appeals.

## ANALYSIS

### Sufficiency of Evidence

M.F. asserts that the trial court erred in detaining M.F. because the record did not provide sufficient evidence to find that she was gravely disabled under RCW 71.05.020(25) or that a nexus existed between her mental health condition and any danger of physical harm. Because the record is sufficient to persuade a fair-minded person, the trial court did not err.

We review a trial court's findings of fact on involuntary treatment for substantial evidence. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). We then consider whether the findings of fact support the conclusions of law. *A.F.*, 20 Wn. App. 2d at 125. Substantial evidence exists if it is sufficient to persuade a fair-minded person of the truth of the asserted premise. *A.F.*, 20 Wn. App. 2d at 125. "When considering if there was sufficient evidence, we view the evidence in the light most favorable to the petitioner." *A.F.*, 20 Wn. App. 2d at 125.

A person is gravely disabled under prong A of RCW 71.05.020(25) if, as the result of a behavioral health disorder, that person "is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(25). To establish grave disability

5

under prong A, the petitioner must present "recent, tangible evidence of failure or inability to provide for such essential human needs . . . which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *In re Det. of LaBelle*, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986). The danger of physical harm need not be imminent or actively ongoing to allow for commitment. *LaBelle*, 107 Wn.2d at 204-05.

Here, Fairfax provided the court with recent, tangible evidence of M.F.'s inability to manage a potentially fatal medical condition.

As indicated by Dr. Roedel's testimony, syphilis is a dangerous and potentially fatal disease, especially left untreated. Hospital records indicate that M.F. was diagnosed with syphilis at least eight months before the admission leading to her detention. M.F. suggests that nothing in the record indicates that a provider informed her of her diagnosis or how to treat it. But as documented in her admitting notes, M.F. had been prescribed an outpatient doxycycline[1] treatment. The fact that she presented with syphilis again, eight months later, indicates that she left the condition untreated. Now subject to a high risk of neurosyphilis[2] and other iterations of the disease, the record displays that M.F.'s inability to provide for her health and safety presents a high probability of serious harm.

---

[1] Doxycycline is a tetracycline antibiotic that inhibits bacterial growth and is used for bacterial infections, including syphilis.

[2] Neurosyphilis is a complication of syphilis that can cause serious neurological issues, such as stroke and paralysis.

Fairfax also provided evidence that M.F.'s inability to manage her syphilis stemmed from her behavioral health disorder and its associated symptoms.

M.F. presented at Harborview agitated and with suicidal ideations. Over the course of her stay, M.F. became progressively more disoriented, responding to treatment provider's attempts to discuss her syphilis diagnosis with delusions about drug rings or hyper-focus on her late uncle's funeral.

Once at Fairfax, M.F. continued to display delusional thought content and paranoid ideation. She exhibited no insight into her mental health diagnosis, and though consistently medication compliant, did not acknowledge any need for treatment. Leading up to her probable cause hearing, M.F. regularly struggled to coherently discuss her syphilis treatment or establish a discharge plan.

M.F. asserts that the record is insufficient to support a finding of grave disability because M.F. cared for her syphilis infection once she received medical instruction and she was able to engage in discharge planning at the time of the hearing.

To the former, M.F. suggests that the fact that a person was diagnosed with an infection eight months ago, and tests positive again for the same infection, does not necessarily mean it went untreated for those eight months; it could simply have been reinfection. But this claim is unpersuasive.

M.F. herself testified that she did not undergo treatment, through shots or pills, until the April 2024 diagnosis. That M.F. was diagnosed with syphilis at least eight months before is undisputed. Without undergoing any treatment, M.F. could not have overcome the initial infection in order for her to have contracted

the infection again.  Viewing the evidence in the light most favorable to Fairfax, the record indicates that M.F. left her syphilis untreated for at least eight months.

To the latter, M.F. points to her treatment compliance and her ability at the probable cause hearing to explain her diagnosis and the treatment needed to cure it.  But the record shows the consistency in her inability to engage in a discharge plan, the inconsistency in her ability to follow all hospital instructions, and her frequent and rapid mood swings.  In fact, the court specifically noted that a less restrictive alternative would not be appropriate because M.F. was still symptomatic and disorganized, needed frequent redirection, and had not indicated that she had any outpatient treatment.  Because the success of her treatment is so time-sensitive and the record fails to show any consistency in her ability to manage her own health, substantial evidence supports the trial court's finding of grave disability.

Lastly, M.F. contends that Fairfax fails to establish a connection between her behavioral health disorder and any danger of physical harm.  But as documented above, the record clearly indicates that M.F.'s behavioral health disorder impacted her ability to comply with a syphilis treatment plan.  Because syphilis leads to devastating and sometimes fatal results, the record shows a risk of resulting physical harm.  And because the danger of physical harm need not be directly imminent or on-going, this is enough to establish the required nexus.

Because the evidence in the record is sufficient to persuade a fair-minded person that M.F.'s behavioral health disorder presents a high probability of

8

serious harm resulting from a failure to provide for her essential health needs, the trial court did not err in detaining M.F. for an additional 14 days.

Unconscious Bias

M.F. also contends that unconscious bias likely influenced the trial court's grave disability analysis. Because the trial court relied only on the symptoms described in the medical record and the relationship between those symptoms and M.F.'s ability to manage her own medical needs, M.F.'s argument is misplaced.

If racial bias is a factor in a jury or court's decision, that decision does not achieve substantial justice and must be reversed. *Henderson v. Thompson*, 200 Wn.2d 417, 421-22, 518 P.3d 1011 (2022).

M.F. highlights the very real fact that Black Americans are more likely to be diagnosed with unspecified psychosis and involuntarily hospitalized. Noting that some of the language used in her evaluations is stereotypically attributed to Black women, M.F. contends that racial bias played a role in the trial court's grave disability analysis. But the trial court relied only on the symptoms described in the medical record and the relationship between those symptoms and M.F.'s ability to manage her own medical needs in finding her gravely disabled.

As the trial court noted in its oral findings, M.F.'s symptoms directly interfered with her ability to manage a serious, potentially fatal, infection outside of the hospital. And though the trial court did note her labile mood and temper, which can be stereotypically and improperly attributed to Black women, the court

did so with specific reference to her documented mental health disorder.  The court also expressly relied on behaviors other than those stereotypically attributed to Black women, such as her confusion, need for increased doses of medication, and consistent inability to engage in discharge planning.

The trial court's finding of grave disability was not based on unconscious or improper racial biases, but rather grounded in the documented psychiatric symptoms she displayed before a variety of health care providers.

We affirm.

WE CONCUR:

10