# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 59579-6-II |
| J.P. | |
| Appellant. | UNPUBLISHED OPINION |

CRUSER, C.J.—J-YP attempted suicide while incarcerated and was then involuntarily committed for 14 days of mental health treatment. Hospital doctors then petitioned for an additional 90 days of involuntary commitment. The trial court granted the petition, finding that J-YP was gravely disabled as a result of a behavioral health disorder which manifested as a severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control.

J-YP appeals the order involuntarily committing him, arguing that there was not substantial evidence to support the finding that he was gravely disabled or the conclusion that involuntary commitment was appropriate. We affirm.

FACTS

J-YP was incarcerated in December 2023 after stabbing his father with a kitchen knife. J-YP was set to be released in late March 2024. A few weeks before his release date, J-YP attempted suicide by consuming a large quantity of painkillers. After medical personnel intervened and stabilized him, J-YP was detained to Western State Hospital. Hospital doctors then petitioned for

an order committing J-YP to the hospital for 14 days of involuntary mental health treatment, and the trial court granted the petition on March 28.

In early April, near the end of the 14 days, hospital doctors petitioned the trial court to order 90 additional days of involuntary treatment, alleging that J-YP was still gravely disabled as the result of a behavioral health disorder. In a declaration, the petitioners stated J-YP was diagnosed with schizoaffective disorder, bipolar type, and substance use disorders for alcohol and cannabis. The petition stated that during an evaluation before his 14-day detention, J-YP demonstrated "delusional thought content with paranoid and religious themes." Clerk's Papers (CP) at 56.

Since his suicide attempt, J-YP had disclosed several prior attempts at self-harm or suicide to mental health providers. The petitioners stated that J-YP lacked insight into his mental health, and "expressed uncertainty regarding his reason for engaging in [self-harming] behaviors," although in one interview "he attributed his suicidal ideation to feeling targeted due to his race." *Id.* at 50, 57. J-YP also had a history of aggression, having stabbed his father on a prior occasion several years before the incident that led to his 2023 incarceration.

J-YP had previously been detained for mental health reasons at least four times since 2020, including two hospital commitments. Although J-YP told doctors that he was willing to remain on medication, the doctors stated that this assertion did "not appear to reflect genuine insight and improvement, as evidenced by his difficulty in articulating clear reasoning for doing so and a historical pattern of offering similar responses but not following through." *Id.* at 59. For example, during a competency evaluation in 2019, J-YP told the evaluator that he took an antipsychotic "because he would be 'insane . . . crazy' if he did not." *Id.* "Despite seeming to express insight,

his pattern of poor adherence leading to psychiatric decompensation was repeated and led to another violent attack on his father." *Id.*

At the commitment hearing in late April, J-YP asked to represent himself. After a colloquy, the trial court found that J-YP was competent to waive counsel, and that the waiver was knowing and voluntary. J-YP proceeded to represent himself with standby counsel.

A hospital psychologist who evaluated J-YP before his 14-day commitment and was familiar with his records and had consulted with his treatment team testified that J-YP presented with religious preoccupation, delusional or non-reality-based thinking, and paranoia, with only superficial insight into his condition or how his symptoms impaired him. She testified that J-YP's compliance with treatment and taking medication was "quite superficial and motivated by wanting to be released rather than a genuine understanding of why he should remain on medication." Verbatim Rep. of Proc. (VRP) at 72. "He has said that he needs to stay on them to prevent him from being crazy, but I don't believe that he has a genuine understanding of what those medications are for or what they're able to do for him." *Id.* at 77.

The psychologist testified that J-YP's condition affected both his cognitive and volitional control. She stated that J-YP's "underlying paranoia that he continues to express and his beliefs that he's being targeted" impaired his volitional control and drove his history of violent incidents. *Id.* at 74-75. The psychologist also testified that J-YP's thought processes reflected "non-reality-based thinking"; his belief that he was being targeted, "which does not appear to be reality-based"; and were centered on religion to a degree beyond that usually seen in the normal conduct of a faith community. *Id.* at 75. She explained that the religious preoccupation impaired J-YP's ability to make rational decisions, in part because he believed that "he has no active role in what will

happen." *Id.* at 87. For example, "it appears that often, when asked sort of more difficult questions, the response immediately goes to that 'God will make everything right,' 'God will sort of intervene and make it okay' rather than articulating what [his] role would be in that." *Id.* at 80.

The psychologist observed that when J-YP decompensated, he exhibited behaviors that attracted the attention of police or crisis responders, resulting in incarceration or hospitalization. This pattern had repeated on previous occasions, where J-YP stopped engaging in treatment, began using substances, and decompensated. Although there had been "a very mild improvement" in J-YP's symptoms while he had been medicated during his 14-day commitment, the psychologist stated that J-YP would not be able to meet his own basic health and safety needs and would be at risk of serious harm if released immediately. *Id.* at 85.

On cross-examination, the psychologist specified that jail records showed that J-YP had previously not consistently accepted prescribed medications. J-YP asked if it was possible that the jail staff lied; the psychologist responded that nothing in the records cast doubt on their accuracy.

Standby counsel also cross-examined the psychologist. The psychologist acknowledged that she had not evaluated J-YP since March 25, before the beginning of his 14-day commitment, and did not work on his ward, so she had not personally observed him since that evaluation. But she had performed an updated review of his records and spoken to his treatment team in the interim. She also acknowledged that since being committed in March, J-YP had expressed verbal aggression, but not any physical aggression.

J-YP spoke at the hearing, explaining that he did not want the trial court to believe that he was paranoid or not taking his medication.

4

The trial court found that the lack of a recent evaluation impacted the reliability of the psychologist's testimony, but nevertheless found that the psychologist's statements based on her review of J-YP's records and conversations with his treatment staff constituted clear, cogent, and convincing evidence that J-YP was gravely disabled. The trial court stated that it believed that J-YP's "response to the need for medication and his willingness to follow through in the community is superficial and is based on his desire to leave the hospital and is not grounded on any serious improvement that he's had over his stay" at the hospital. *Id.* at 96.

In a written order, the trial court found that J-YP had a behavioral health disorder which "manifest[ed] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions" and was "not receiving such care as is essential for health and safety." CP at 73. As a result, the trial court concluded that involuntary commitment was appropriate because J-YP was gravely disabled, and the trial court granted the petition for 90 days of involuntary treatment.[1]  J-YP appeals.

## ANALYSIS

J-YP assigns error to the trial court's finding that he was gravely disabled and to the conclusion that involuntary commitment was appropriate. J-YP argues that the trial court erred by finding him gravely disabled because the State did not present substantial evidence to support that finding. J-YP contends that the State did not present clear, cogent, and convincing evidence that J-YP currently suffered a severe deterioration in routine functioning, or that there was a nexus between his mental health symptoms and any failure to care for his own health or safety.

---

[1] The trial court also found that a less restrictive alternative was in J-YP's best interest, but our record does not contain an order detaining him under less restrictive conditions.

Specifically, he asserts that the State did not prove that he was currently unable to provide for his own health and safety, but instead relied on historical evidence such as his suicide attempt.

The State responds that the trial court properly gave significant weight to J-YP's prior history of decompensation and discontinuation of medications to conclude that he would not receive care necessary for his health or safety if released. We agree with the State.

A trial court may order 90 days of additional involuntary treatment after an initial 14-day commitment if the person is gravely disabled. RCW 71.05.280(4); .320(1). Grave disability has two definitions; J-YP was committed under the second, which states that a person is gravely disabled if they "as a result of a behavioral health disorder: . . . manifest[ ] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and [are] not receiving such care as is essential for his or her health or safety." RCW 71.05.020(25).[2] The State must prove that the person is gravely disabled "by clear, cogent[,] and convincing evidence." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986); RCW 71.05.310.

"An appellate court reviewing the trial court's decision on involuntary commitment considers whether the trial court's findings of fact are supported by substantial evidence and if the court's findings of fact support the court's conclusions of law." *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). "[W]here the State must prove its case by clear, cogent and convincing evidence, the evidence [supporting the trial court's findings] must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence."

---

[2] This statute has been amended since J-YP's commitment hearing, but the amendments do not affect our analysis. LAWS OF 2024, ch. 371, § 18. Accordingly, we cite to the current version of the statute.

*LaBelle*, 107 Wn.2d at 209. Instead, "the ultimate fact in issue must be shown by evidence to be 'highly probable.' " *Id.* (quoting *Pawling v. Goodwin*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). We "view the evidence in the light most favorable to the petitioner." *A.F.*, 20 Wn. App. 2d at 125. "We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence." *Id.*

A trial court *must* consider a person's historical behavior when determining if the person is gravely disabled. RCW 71.05.245(1). "Symptoms or behavior which standing alone would not justify civil commitment may support a finding of grave disability" when the symptoms "are closely associated with symptoms or behavior which preceded and led to a past incident of involuntary hospitalization, severe deterioration, or one or more violent acts;" and when "without treatment, the continued deterioration of the respondent is probable." RCW 71.05.245(2).

J-YP's history included repeated self-harm, two separate instances of stabbing his father, and at least four hospitalizations for mental health treatment, not including the current detainment which was prompted by a suicide attempt. His symptoms included paranoia and a belief that he was being targeted—which he demonstrated at the involuntary commitment hearing when he suggested that jail staff were lying and falsifying documents about him refusing medication. This was all evidence that the trial court had a statutory obligation to consider. RCW 71.05.245(1).

Additionally, while the trial court stated that the lack of a recent evaluation impaired the reliability of the psychologist's testimony regarding her observations during the evaluation, the trial court nevertheless found it appropriate to rely on the psychologist's review of J-YP's records and conversations with his treatment team. The records review and conversations with the treatment team were the basis for the psychologist's observation that when J-YP stopped taking

medication and participating in treatment, he decompensated and "exhibit[ed] behaviors that bring him to the attention of law enforcement and/or crisis responders," resulting in incarceration or hospitalization. VRP at 76. She also cited records showing that, as a result of his religious preoccupation, J-YP had a pattern of stating " 'God [would] make everything right' . . . rather than articulating what [his] role would be" in keeping himself healthy and safe. *Id.* at 80. Although consistent medication had mildly improved J-YP's symptoms, the psychologist asserted that J-YP's current condition and history of discontinuing treatment meant that he likely would not ensure his basic health and safety needs were met if immediately released.

Further, the trial court found that J-YP's statements that he would take medication and seek treatment in the community were "superficial" and "based on his desire to leave the hospital" rather than being "grounded on any serious improvement." *Id.* at 96. And we do not review a trial court's credibility determinations on appeal. *A.F.*, 20 Wn. App. 2d at 125.

In sum, J-YP had a history of repeated arrests for violent incidents and hospitalizations for self-harm and suicide attempts that were closely associated with symptoms from his schizoaffective and substance use disorders. He lacked insight into why he committed these acts, and he deflected to stating that God would intervene rather than acknowledging what he could do to keep himself and other safe. And while J-YP had shown minimal improvement during his 14-day commitment, the psychologist did not believe that he was able to keep himself and others safe if released into the community. Viewing this evidence in the light most favorable to the petitioners, it was highly probable that J-YP, as a result of a behavioral health disorder, experienced severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his actions and would not receive care essential for his health or safety if

released. *LaBelle*, 107 Wn.2d at 209; *A.F.*, 20 Wn. App. 2d at 125. Accordingly, there was substantial evidence to support the trial court's finding to that effect, and that finding supported the conclusion that J-YP was gravely disabled. We affirm the involuntary commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

MAXA, J.

GLASGOW, J.