IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>E.G. | No. 87108-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — E.G. was brought to the emergency department at MultiCare Auburn Medical Center after exhibiting an "altered mental status" at a Safeway store. E.G. was transferred to Fairfax Hospital and detained under Washington's involuntary treatment act (ITA), chapter 71.05 RCW, for 120 hours. The State petitioned for an additional 14 days of inpatient treatment, and the trial court held a probable cause hearing.

After hearing testimony, the trial court found E.G. to be gravely disabled as a result of her inability to care for herself and granted the petition. E.G. appeals, asserting the evidence was insufficient to justify detention. Because the evidence was sufficient to support a finding that E.G. suffered from a mental health disorder that had a substantial and adverse effect on her cognitive and volitional functioning such that she could not manage her essential human needs of health and safety, nor engage in treatment or realistic discharge planning, we affirm.

FACTS

Background

E.G. had an extensive history of involuntary commitments beginning in January 2010.  Following a two-month involuntary commitment at Wellfound Behavioral Health Hospital, E.G. was discharged to an adult family home (AFH) in Spanaway, Washington on June 25, 2024.  The first two weeks of E.G.'s stay at the AFH were unremarkable and she was "calm."  Then, E.G. became disruptive, complained extensively, refused to eat the food prepared for her, "raid[ed] the fridge," washed her roommate's dog at 5 a.m. without permission, and slept poorly.  E.G. was not physically violent during her stay at the AFH.

About five weeks after E.G. arrived at the AFH, she asked to be taken to a dental appointment but because of the lack of notice, no staff could go with E.G. When the AFH owner explained this to E.G., she became angry and told him that she would walk to the appointment.  E.G. left the AFH to go to the dentist and did not return.[1]

Three days later, E.G. was transported to the MultiCare Auburn Medical Center emergency department (ED) after exhibiting an "altered mental status" in a Safeway store.  While in the ED, E.G. refused medical care, made nonsensical statements, was placed in restraints because of her attempts to fight off staff, and exhibited increased agitation.  During her initial exam, E.G. was unable to hold a conversation and her speech was rapid and difficult to understand.  A registered

---

[1]  E.G. testified that the family dental clinic was a mile or two from the AFH.

2

nurse noted that E.G. "sp[oke] very vile, nonsensical at times," and getting information from her was difficult.

E.G.'s behavioral health history indicated that she was diagnosed with Bipolar 1 disorder and schizoaffective disorder, but she had no current outpatient mental health provider. Her chart stated that when she was decompensated, she wandered into traffic, walked around barefoot, and dressed inappropriately for inclement weather. E.G. lacked insight into her mental illness and need for treatment and stabilization.

While in the ED, E.G. complained that her feet hurt and she had walked 100 miles that day. E.G. stated that she "had some crazy shit happening for the past three days." E.G. reported that she did not have a mental health diagnosis and that she did not need psychiatric medication. Additionally, E.G. stated that she stopped taking her psychiatric medications because she did not like the way they made her feel, but she was unable to confirm when she stopped taking her medications. She denied auditory or visual hallucination and suicidal or homicidal ideation.

Hospital labs revealed E.G. had a urinary tract infection (UTI), trace ketones, and tested positive for alcohol. While E.G. admitted she drank "some" alcohol the night before, she denied daily alcohol use or illicit drug use. By 10:00 p.m. that same day, E.G. was considered "medically cleared and now sober." The hospital ordered a hold on E.G.

Reesa Joyce, a social worker at MultiCare, met with E.G. while she was in the ED. Joyce's initial assessment of E.G. stated that E.G. spoke in a loud,

3

pressured manner, had limited eye contact, and was not redirectable. Joyce noted E.G. made many delusional, tangential, and disorganized statements. When asked about the AFH, E.G. stated, "they had the fleas, flies, dogs, things biting me." E.G. said she remembered going to a dentist appointment because her teeth were rotting. When asked about the rest of her day, E.G. stated she continued to go to dentist appointments "again, again, again." E.G. reported going to Sumner, Kent, and Auburn after she left the AFH, but was unable to explain how she got to those cities.

Joyce referred E.G. to King County designated crisis responders for involuntary commitment based on E.G.'s presentation and history of decompensation. Joyce attempted to discuss less restrictive options with E.G., but E.G. declined all options, stating she wanted to be released to a family member's home. E.G.'s chart indicated several family members previously obtained protection orders against E.G. because of her erratic behavior, and E.G. was unable to provide contact information for any family members. The designated crisis responder met with E.G. and found that E.G. was unable to describe how she would care for herself in the community, and she met the criteria for initial involuntary hospitalization under the definition of gravely disabled. E.G. was transferred and admitted to Fairfax on August 9, 2024.

While at Fairfax, E.G. received a diagnosis of Bipolar 1 disorder with the most recent episode being manic with psychosis. E.G.'s psychiatric evaluation noted she was guarded with paranoid ideations. E.G.'s mental status exam stated she was at a high risk for violence. Throughout her stay at Fairfax, E.G.

entered into verbal arguments with staff and other patients, threw milk and water at a patient, slept poorly, and refused medication. At times, E.G. resisted medication to the point she needed to be restrained for staff to administer medication. When asked how she cares for herself, E.G. stated she was saving the monthly $914.00 she received in supplemental security income to buy a Hummer vehicle and it did not matter how she cared for herself. She did not have any suicidal or homicidal thoughts and was generally alert and oriented as to time, place, and person. On August 15, 2024, the State petitioned to detain E.G. for 14 days on the basis of grave disability under RCW 71.05.240. The State's petition alleged that E.G. was gravely disabled under both RCW 71.05.020(a) and (b).

<u>Probable Cause Hearing</u>

The court held a probable cause hearing on August 16, 2024. The State called three witnesses: the AFH provider, the court evaluator at MultiCare, and Anita Vallée, a social worker employed by Fairfax. The AFH provider testified that E.G. would not be welcome back to the home because of her disruptive behavior, and he was not aware of any other housing available to her. During the hearing, MultiCare's court evaluator summarized E.G.'s condition and behaviors at the time she was admitted, noting the hospital's overall impression was that E.G. was decompensated and suffered from bipolar disorder and psychosis.

Vallée testified E.G.'s working diagnosis was Bipolar 1 disorder and noted E.G.'s observed symptoms included agitation, screaming, grandiose delusions, paranoia, hostility, impaired judgment, and impaired insight into her own illness.

Vallée noted that during E.G.'s stay at Fairfax, E.G. took a shower with her clothes on, had poor boundaries with peers and staff, spit on staff and peers, and screamed insults. Additionally, Vallée testified that E.G. refused her scheduled antipsychotics for several days. Vallée stated E.G.'s behavioral health disorder impaired her understanding of relations between the facts and a willingness to accept treatment. Vallée opined that E.G. was gravely disabled and was at a substantial risk of harm to herself because of her decompensation, homelessness, refusal of medical care, and her lack of treatment for her UTI. Vallée recommended that E.G. remain in psychiatric hospitalization until she stabilized.

At the hearing, E.G. testified on her own behalf. E.G.'s testified that when she left the AFH, she went to the dentist office, then the next day she went to Sumner and picked up brochures at a resource center for the unhoused. E.G. testified that she did not return to the AFH because she was advised against it by her three lawyers. E.G. stated she owned three houses. When testifying about her UTI, E.G. said, "and then I'm 50, I have urinary tract infections. So what? Maybe I was wearing tight . . . jeans." Additionally, E.G. testified that if she wanted to make any changes concerning medication, she could "go to a counselor or Urgent Care or actual medical doctor or a psychologist and talk to them first." Throughout the hearing, E.G. interrupted testimony to the point that the court and her attorney asked her to stop.

The court considered the witness testimony and evidence admitted and concluded E.G. suffered from a mental health disorder with a working diagnosis

6

of bipolar disorder-type 1, and that the disorder had a substantial and adverse effect on her cognitive and volitional functioning. The court concluded that E.G. was gravely disabled under RCW 71.05.020(25)(a) but did not find her gravely disabled under prong b. The court granted the State's petition for involuntary treatment. E.G. appeals.

ANALYSIS

E.G. claims the evidence was insufficient to support detention and that she was not in danger of serious physical harm because of her behavioral disorder. But because of her mental health disorder, E.G. decompensated, lost her housing and had no realistic plan regarding alternative housing, left medical ailments untreated, did not have a health care provider, and did not have the ability to engage in discharge planning; therefore, sufficient evidence supports the trial court's findings and conclusion granting the petition for a 14-day commitment.

The State's burden of proof for a 14-day commitment due to a grave disability is a preponderance of the evidence. RCW 71.05.240(4)(a). A person suffering from a mental disorder can be found gravely disabled under either or both of two different statutory definitions. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). Under the first definition, which is the relevant definition here, the court considers if the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(24)(a).

We review whether a trial court's finding of facts for involuntary treatment is supported by sufficient, substantial evidence. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). " 'Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person.' " *A.F.*, 20 Wn. App. at 125 (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). When considering whether sufficient evidence exists, we view the evidence in the light most favorable to the petitioner. *A.F.*, 20 Wn. App. at 125. We do not review a trial court's decisions regarding witness credibility or the persuasiveness of the evidence. *A.F.*, 20 Wn. App. at 125.

Under RCW 71.05.020(25)(a), a person is gravely disabled if, because of a behavioral disorder, the individual is in danger of serious physical harm resulting from a failure to provide for their essential human needs of health or safety. That E.G. suffers from a behavioral disorder is uncontested, which is the threshold inquiry under RCW 71.05.020. To establish grave disability under RCW 71.05.020(25)(a), the party seeking involuntary treatment must, "present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment." *LaBelle*, 107 Wn.2d at 204-05. The trial court need not find the person is in "imminent" danger because their admission to the hospital will generally eliminate the imminency of any risk to their health. *LaBelle*, 107 Wn.2d at 203.

First, E.G. asserts that sufficient evidence does not exist to support a finding that, as a result of a behavioral health disorder, she failed to provide for her essential human needs. But E.G.'s hospital records and the testimony

8

presented at trial support the court's conclusion that E.G. suffered from a mental health disorder that had substantial, adverse effects on E.G.'s cognitive and volitional functioning. Additionally, the record reflects that E.G.'s plan to care for herself was to use all of her funds to purchase a Hummer vehicle, but no evidence suggests that action would satisfy her essential need for housing. The evidence demonstrated E.G.'s decompensation, including lack of sleep, impaired judgment, disruptiveness, and paranoid ideation—all of which impacted E.G.'s ability to provide for her essential needs, such as medical care and housing.

The record reflects that E.G. had a UTI, trace ketones, and foot pain upon admittance to the ED. E.G. contends that these medical problems were not serious, as the foot pain was resolved without medical attention. But E.G. seemed unconcerned about having a UTI or receiving treatment for it. Additionally, E.G.'s behavior upon admittance demonstrated that medical treatment was not being met outside the hospital or even at times after she was admitted, as evidenced by E.G.'s refusal to take her antipsychotic medication. Relying on this evidence, the trial court appropriately determined that E.G.'s mental health disorder impacted her ability to provide for her medical needs.

E.G. also contends sufficient evidence does not exist to support a finding that she lacked adequate housing. But, as indicated by the AFH owner's testimony, E.G. was not welcome to return to the AFH because of her disruptive, manic behavior that occurred after she stopped taking her medications. Importantly, the AFH owner was not aware of any other housing options available to E.G. None of the family members or people that E.G. wanted to be

9

discharged to could be contacted.  Additionally, E.G. indicated that she owned three houses but no evidence suggests these options were realistic.

E.G. asserts that being unstably housed is not a sufficient basis for a finding of grave disability.  While it is true that "eccentric, substandard" choices that are harmless do not risk psychiatric detention, the *LaBelle* court distinguished between housing based on lifestyle choices and housing as a result of deteriorated condition.  107 Wn.2d at 210.  In *LaBelle*, the trial court found LaBelle to be gravely disabled, based in part, on his inability "to form realistic plans for taking care of himself outside the hospital setting other than resuming a lifestyle of living on the streets without adequate food and shelter."  107 Wn.2d at 210.  The Washington Supreme Court affirmed, noting, "Although uncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital, the evidence here indicates that LaBelle's plans to live on the streets are not the result of a choice of lifestyle but rather a result of his deteriorated condition which rendered him unable to make a rational choice with respect to his ability to care for his essential needs."  *LaBelle*, 107 Wn.2d at 210.  Similarly, here, E.G.'s departure from the AFH after exhibiting disruptive behavior, ceasing to take antipsychotic medications, and extensively walking are more likely a result of her inability to care for her essential needs rather than a rational choice concerning housing.

Next, E.G. asserts that, even if the trial court correctly found she failed to provide for her essential needs, sufficient evidence did not exist to prove that her failure to provide for her essential needs placed her at a "high probability of

serious physical harm within the near future." *LaBelle*, 107 Wn.2d at 205. As noted above, the trial court need not find the person is in "imminent" danger because their admission to the hospital will generally eliminate the imminency of any risk to their health. *LaBelle*, 107 Wn.2d at 203. But Vallée's testimony indicated E.G.'s impairment placed her at a high risk of harm because of E.G.'s failure to meet her medical needs, including ceasing to take her antipsychotic medication, an untreated UTI, her lack of housing, and her need to be stabilized.

Finally, as reflected in the record, MultiCare's social worker attempted to discuss less restrictive alternatives with E.G., but E.G. refused all options. Additionally, Vallée's testimony supports the fact that outpatient treatment was unrealistic because E.G. did not have a health care provider or housing, and had stopped taking her medication at the AFH and hospital. Therefore, after consideration of less restrictive alternatives as required by RCW 71.05.240(4)(a), the court properly found that less restrictive options were not appropriate for E.G.

Because the record is sufficient to persuade a fair-minded person that, as a result of a behavioral health disorder, E.G. was in danger of serious physical harm resulting from a failure to provide for her essential human needs of health and safety, we uphold the detention.

We affirm.

_____

WE CONCUR:

_____          _____
Díaz, J.                          Chung, J.

11