# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of:

C.S.

No. 87155-2-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — C.S. challenges a superior court's order committing him to 14 days of involuntary detention and treatment for his mental health disorder. He argues that the superior court's findings of fact are not supported by sufficient evidence and do not support the conclusion that C.S. is gravely disabled. We disagree and affirm.

## FACTS

In 2022 C.S. began living at North Star, a permanent supportive housing building operated by Downtown Emergency Service Center (DESC). On August 6, 2024, DESC-employed clinical support specialist Grayson Lusk-Hussong referred C.S. to a King County designated crisis responder with concerns about C.S.' mental health based on recently increased hoarding and hygiene-related behaviors that stemmed from his thought disorder. King County Crisis Commitment records indicate that C.S. has been detained on four prior occasions. Lusk-Hussong and DESC-employed housing stabilization specialist Nicole Dickerson reported that C.S.' baseline behavior of

collecting paper cups and other small items had intensified to the point of C.S. collecting and angrily refusing to throw away spoiled and rotted food covered in mold and maggots. C.S.' apartment was reported as being covered in trash with only a narrow path leading to the back of the unit, having a distinct odor, and being infested with flies.

On August 8 the superior court granted the King County designated crisis responder's petition to commit C.S. for 120 hours of involuntary mental health evaluation and treatment. C.S. was subsequently detained and evaluated at Fairfax Hospital (Fairfax) and, on August 30, Fairfax filed a petition for 14 additional days of involuntary treatment. The superior court held a probable cause hearing on the 14-day petition. Fairfax presented testimony from Dickerson and Dr. Robert Beattey, a licensed clinical psychologist who evaluated C.S. during his initial detention at Fairfax. C.S. testified on his own behalf.

Dickerson worked directly with C.S. for six months on a weekly basis. When they initially started working together, C.S. collected "mostly just paper cups." Recently, however, Dickerson described C.S.' apartment as being hoarded with moldy food and "not habitable." Though C.S. had previously been willing to throw away "a couple garbage bags worth of stuff," he had become less willing to remove food and garbage that had accumulated in his apartment over the last few months. The only food that Dickerson had recently seen in C.S.' unit was expired and had varied degrees of mold,[1] which concerned her. Dickerson testified to seeing C.S. eat expired and moldy food on "[m]ultiple" occasions. In addition, Dickerson observed a decline in C.S.' hygiene. He appeared to not be bathing or changing his clothes and recently lost three teeth within

---

[1] Some of the food was lightly molded and some was covered in green and orange powder.

2

two months. Dickerson expressed concern that if C.S.' hoarding continued, he would "fall [physically] ill from all of the mold in not just the unit, but in the food that he's eating." C.S.' unit needed to be cleaned and "free of mold and flies" before he could move back in.

Based on his evaluation of C.S. at Fairfax,[2] licensed clinical psychologist Dr. Beattey testified to giving C.S. a "working diagnosis" of schizophrenia. He defined schizophrenia as a psychotic disorder that can manifest through symptoms of hallucinations, delusions, formal thought disorder shown by grossly disorganized speech or behavior, and cognitive/emotional impairment. Dr. Beattey opined that C.S. was substantially adversely affected by impairment caused by schizophrenia disorder and that C.S.' "most prominent features are his beliefs and … mood and negative symptoms." Dr. Beattey referenced C.S.' statements to a nurse practitioner at Fairfax that he "was told by a woman to come here. They are screwing with me there. They are messing with me at my apartment."

Dr. Beattey concurred on Dickerson's expressed concerns related to C.S.' physical hygiene, including that C.S. was "physically dirty" and that his hair appear matted. Further, in C.S.' "brief time" at Fairfax, Dr. Beattey observed that he "accrue[d] a significant amount of property" "consist[ing] of cups and … material that is no longer of useful purpose." When Dr. Beattey asked C.S. if he would throw away an empty plastic part of a cup, C.S. "indicated that he would not do that." Dr. Beattey also noted reports that C.S. had not been eating and lost weight. Referring to the hospital records, Dr.

---

[2] Dr. Beattey completed his evaluation by speaking with C.S., reviewing C.S.' records from Fairfax, "including collateral information contained therein," and receiving input from C.S.' treatment team.

Beattey testified that C.S. was admitted because he was found to be eating spoiled food with maggots in it and holding garbage at his apartment.[3]

Dr. Beattey opined that C.S.' mental disorder was manifesting in anxiety and "paranoid delusions about what people are trying to do to him at his apartment," which was "driving" the dangers to his health and safety. Dr. Beattey explained:

> The concern is not so much whether he's eating or not, although his [body mass index] is off the chart low. The concern is equally what he's eating – with descriptions that he is eating food that is molded. There's descriptions in the record of eating food with maggots in it, which in and of itself the maggots aren't going to hurt him, but the quality of the food upon which one finds maggots are certainly not consistent with good health, in most cases.

Dr. Beattey opined that C.S. was gravely disabled because he is in danger of serious physical harm based on his inability to provide for his essential needs of health and safety. Overall, he recommended that C.S. "needs a highly structured environment of an inpatient psychiatric setting in order to keep him safe and restored into his previous level of functioning."

C.S. testified that he is "absolutely" willing to work with the staff at DESC and is "going to try to do what [DESC are] saying" because he "got probably more stuff than [he] needs" and wants to throw away garbage.

The trial court found Dickerson and Dr. Beattey credible. The court found that C.S. was gravely disabled as the result of a behavioral health disorder and that he was in danger of serious physical harm resulting from his failure to provide for his own health

---

[3] Ruling that these statements in C.S.' medical records were hearsay, the court limited their admission only for the basis of Dr. Beattey's expert opinion and not for the truth of the matter asserted or any substantive purposes. See ER 703.

and safety. Relying on Dr. Beattey's testimony, the court stated in its oral ruling[4] that

"the evidence does support that [C.S.] is in danger of serious physical harm by living in

the conditions which he has created, as a result of his mental illness." The trial court

further stated in its written findings of fact:

> [C.S.'] anxiety and paranoid delusion that he was being targeted by people
> at DESC have caused him to hoard and consume expired and moldy food
> and has resulted in the temporary loss of housing.
> …
> [C.S.] lacks insight into his need for treatment, as well as his nutritional
> and hygienic needs, which could lead to harmful consequences including
> becoming ill from eating moldy food.

The court granted Fairfax's petition for up to 14 days of continued treatment. C.S.

appeals.

## DISCUSSION

C.S. contends that there is insufficient evidence to sustain the trial court's

findings that he was gravely disabled. We disagree.

Under the Involuntary Treatment Act (ITA), a trial court may order 14 days of

involuntary commitment if it finds by a preponderance of the evidence that the person is

gravely disabled. RCW 71.05.240(1), (4)(a); see also In re Det. of A.F., 20 Wn. App. 2d

115, 125, 498 P.3d 1006 (2021). A person is gravely disabled if, because of a

behavioral health disorder, they are "in danger of serious physical harm resulting from a

failure to provide for his or her essential human needs of health or safety." RCW

71.05.020(25)(a). To prove this, the petitioner must "present recent, tangible evidence

of failure or inability to provide for such essential human needs as food, clothing,

shelter, and medical treatment which presents a high probability of serious physical

---

[4] In its written findings, the court incorporated by reference its oral findings and conclusions.

harm within the near future unless adequate treatment is afforded." In re Det. of LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986).[5] The ITA is not a mechanism for "imposing majoritarian values on a person's chosen lifestyle" because such lifestyle is viewed as substandard or offensive; the failure or inability to provide for essential needs must be because of a behavioral health disorder and not other factors. Id. at 204.

On review, we consider whether the trial court's findings of fact are supported by substantial evidence and if the findings support the court's conclusions of law and judgment. A.F., 20 Wn. App. 2d at 125. "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person." In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015). In considering sufficiency of the evidence, we view the evidence in the light most favorable to the petitioners. In re Det. of A.M., 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021). We do not review credibility determinations. H.N., 188 Wn. App. at 763.

We reject C.S.' argument that the record does not support a nexus between his behavioral health condition and an inability to provide for his essential human needs as required by RCW 71.05.020(25)(a). Here, there was sufficient evidence that supports the trial court's finding that C.S.' dangerous living conditions and eating behaviors were symptomatic of his behavioral health disorder. Dr. Beattey testified that C.S.' schizophrenia-related anxiety and paranoid delusions were "driving" his hoarding and concerning eating behaviors. Dickerson testified that the state of C.S.' unit was not fit for

---

[5] Labelle cites this definition of "gravely disabled" under former RCW 71.05.020(1)(a) (1979). 107 Wn.2d at 202. That definition has since been as renumbered as RCW 71.05.020(25)(a).

human habitation and that she repeatedly observed C.S. eat expired and moldy food[6] that he had been collecting and storing in his apartment. She believed that C.S.' living environment and eating behaviors posed a risk to his physical health. Dr. Beattey validated these concerns, observing that C.S.' reported consumption of rotting food was generally not safe for physical health. It was in this context that both Dickerson and Dr. Beattey expressed concern for C.S.' apparent inability to maintain his personal hygiene.[7]

C.S. next argues that his case is analogous to A.M., wherein the court reversed a 14-day commitment for lack of evidence that A.M. was gravely disabled because he was not "in danger of serious physical harm."[8] 17 Wn. App. 2d at 334. To support that A.M. was in serious danger of physical harm, the state presented evidence that A.M. believed he had "some sort of intestinal problem" and that he had been refusing to eat or eating only intermittently. Id. at 333. The court concluded that "[b]ecause the record here is devoid of any evidence that AM's reluctance to eat was or could be harmful to AM, we agree that the finding that he was gravely disabled under prong (a) is not supported by the evidence." Id. at 335 (emphasis added). Because the record in the instant case supports that C.S.' hoarding and eating behaviors reasonably posed a

---

[6] C.S.' assertion that Dickerson's testimony regarding his consumption of rotting food was vague is not persuasive. When asked if she had ever observed C.S. consume expired food and mold that she saw in C.S.' apartment, Dickerson answered, "Yes. … Multiple [occasions]." We view Dickerson's testimony in the light most favorable to Fairfax as the petitioner. See A.M., 17 Wn. App. 2d at 330.

[7] Because we conclude that the record supports the trial court's finding of grave disability, we need not address C.S.' challenge to the court's finding that his loss of teeth demonstrates a failure to obtain medical treatment. See In re Det. of Paschke, 136 Wn. App. 517, 521, 150 P.3d 586 (2007) ("We may affirm a trial court's decision on any ground supported by the record").

[8] A.M. cites to former RCW 71.05.020(22)(a) (2018) for its definition of "gravely disabled." 17 Wn. App. 2d at 324, 333. As noted above, this definition has been renumbered as RCW 71.05.020(25)(a).

potential serious danger of physical harm, <u>A.M.</u> is inapposite.

    We affirm.

_Cohen, J._

WE CONCUR:

_Birk, J._